**Joseph MICHAELS,**
**Plaintiff-Counterdefendant-Appellee,**

v.

**Ralph MICHAELS, Everett B. Michaels and Hyman-Michaels Company, Defendants-Counterplaintiffs-Appellants.**

**Nos. 84–1631, 84–1714.**

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 21, 1985.

Decided July 3, 1985.

As Amended Sept. 9 and Sept. 17, 1985.*

* In light of this amended opinion, the petition for rehearing and suggestion for rehearing in banc filed on July 17, 1985, by defendants/counterplaintiffs/appellants, is denied since no judge in active service has requested a vote thereon, and all the judges on the original panel have voted to deny a rehearing. We acknowledge the assistance of the SEC in filing an amicus brief in connection with the petition for rehearing.

Steven L. Bashwiner, Mary Ellen Hennessy, Friedman & Koven, Chicago, Ill., for plaintiff-counterdefendant-appellee.

Lowell E. Sachnoff, Sachnoff, Weaver & Rubenstein, Ltd., Chicago, Ill., for defendants-counterplaintiffs-appellants.

Before WOOD and FLAUM, Circuit Judges, and BROWN, Senior District Judge.*

HARLINGTON WOOD, Jr., Circuit Judge.

This case involves a family squabble between the plaintiff Joseph Michaels and his uncles, defendants Ralph Michaels and Everett Michaels.[1] Joseph claims that when he sold his stock in the family business, the Hyman-Michaels Company ("the Company"), to the Company in January of 1976, his uncles misstated and withheld material information that, if revealed, would have affected his decision to sell. Joseph subsequently brought this action, alleging that his uncles and the Company had violated section 10(b) of the Securities Exchange Act of 1934 and Rule 10b–5 and had committed common-law fraud. Joseph's complaint also charged his uncles with a breach of a fiduciary duty and the Company with a breach of the warranty provision of the contract for the sale of stock. The parties tried the case before a jury in November, 1983, and the jury found for Joseph and against his uncles on the 10b–5, fiduciary duty, and common-law fraud claims, but against Joseph and for the Company on the warranty claims. The jury assessed damages at $750,000 and also awarded Joseph $200,000 in punitive damages on the common-law fraud claim. The district court subsequently denied defen-

---

* The Honorable Wesley E. Brown, Senior District Judge for the District of Kansas, is sitting by designation.

1. To avoid confusion about which of the Michaels we are referring to, we will refer to them by their first names.

dants' motion for judgment notwithstanding the verdict or a new trial, awarded Joseph prejudgment interest, and directed a verdict for Joseph on the Company's counterclaim.

This appeal raises a number of issues. The defendants argue that they did not violate section 10(b) or Rule 10b–5 because (1) the withheld information was immaterial as a matter of law, (2) they did not possess the requisite scienter, and (3) the plaintiff did not rely on any misstatement and would have sold his stock even if he had known the withheld information. The defendants also challenge several of the district court's evidentiary rulings, its denial of their motion for a new trial, and the directed verdict for the plaintiff on the Company's counterclaim. We affirm.

## I.

The Hyman-Michaels Company was in the business of purchasing, processing, and distributing scrap iron and steel. In mid-1975, Everett owned or controlled approximately fifty percent of the outstanding voting common stock of Hyman-Michaels, Ralph owned or controlled approximately thirty-six percent, and Joseph owned fourteen percent. On January 27, 1976, Joseph agreed to sell his shares to the Hyman-Michaels Company for $300 a share. Three days later, Joseph delivered the stock, resigned from his offices in the Company, and received $981,276.73. In July, 1976, Everett and Ralph sold the assets of the Company for approximately $13.4 million plus lifetime employment contracts. Joseph claims that Everett and Ralph withheld three material facts from him: (1) that the Continental Illinois National Bank ("Continental Bank") had not said "no" to the Company's loan request; (2) that Everett and Ralph decided to retain a professional financial firm to obtain a purchaser for Hyman-Michaels's assets; and (3) that Ralph had met with Angus Littlejohn in London and that Littlejohn had agreed to contact some prospective purchasers.

## A.

Between 1966 and 1976, Hyman-Michaels negotiated with approximately ten different companies in unsuccessful attempts to sell either the Company's assets or the stock owned or controlled by Ralph, Everett, and Joseph. In mid-summer 1975, Ralph began discussions with the Commercial Metals Company ("Commercial Metals") designed to effect a sale of the assets of Hyman-Michaels. The two parties discussed prices, based on asset value, of approximately $14 million. On September 5, 1975, while the Commercial Metals negotiations were ongoing, Ralph, Joseph, and Al Moeng (a Hyman-Michaels financial officer) met with Angus Littlejohn, a consultant to International Carbon & Minerals Corporation ("ICM"), and John Samuels, the chairman of ICM, to discuss the possibility of ICM acquiring Hyman-Michaels. A purchase price in the range of $12 to $14 million was mentioned, but Ralph terminated the meeting without further pursuing Samuels's proposal because Ralph felt that the ongoing discussions with another company (Commercial Metals) precluded such a dialogue. Ralph told Littlejohn and Samuels that he would contact them if negotiations with the other company fell through.

The Commercial Metals negotiations ended in December, 1975. Worried about Everett's health and the possible problems for Hyman-Michaels if Everett would die and his shares go into probate, Ralph suggested that the Company borrow money and buy back Everett's common stock for $300 per share. This price was less than the stock's book value, but Everett agreed to accept $300 because Ralph said that was all the Company could afford. Ralph and Al Moeng consequently contacted Bruce Simons, a loan officer at Continental Bank, about borrowing the approximately three million dollars needed to buy out Everett. Ralph also advised Joseph that all three shareholders would need to sign a "unanimous stockholders consent" before the Company could borrow money for Everett's shares.

While the Company was negotiating with Continental Bank for a loan, Ralph told Joseph that, after Everett's stock was purchased, Ralph would own or control about seventy-five percent of Hyman-Michaels's voting stock with Joseph owning approximately twenty-five percent of that stock. Ralph also said that he intended to place his wife and his son-in-law on Hyman-Michaels's Board of Directors when Everett left the Company. Joseph consequently became concerned about what would happen to his family if he or Ralph died, given Ralph's wife's apparent ill-will toward Joseph's wife. Joseph therefore sought advice from Harrison Fuerst, a friend who practiced law in Cleveland, Ohio. Fuerst suggested that Joseph ask Ralph to accept one of three proposals: (1) that Hyman-Michaels offer Joseph a buy-sell agreement for his stock; (2) that Ralph and Joseph place their stock in a voting trust so that each would have equal votes; or (3) as a last and least desirable alternative, that Hyman-Michaels purchase Joseph's stock at the same time and for the same price that it purchased Everett's stock.

Joseph and Fuerst presented these proposals to Ralph, Moeng, and Marvin Chapman, the Company's lawyer, on January 4, 1976. Either Ralph or Chapman rejected the first two proposals, but Ralph agreed to ask Continental Bank for an additional one million dollars to buy Joseph's shares along with Everett's. Ralph said, however, that he thought Joseph's request would "kill the deal" and that, as far as Ralph was concerned, Joseph was "out" of Hyman-Michaels no matter what Continental said. After this meeting, Ralph and Chapman went to Everett's house to report what had happened; Everett agreed that the Company should buy out Joseph. When Chapman related Joseph's desire not to be kicked out of the Company and lose his job, Everett responded, "I don't give a damn."

On January 5, 1976, Ralph and Moeng went to Continental Bank and requested the additional financing to buy Joseph's stock. Later that day, Simons told Ralph that the bank would not loan Hyman-Mi-

chaels either the three million dollars originally requested or the four million dollars unless the loan were secured with Ralph's personal guarantee. Moments later, Joseph was summoned to Moeng's office, where Ralph told him, "Joe, you're out. The bank has said no." Ralph reiterated that Joseph was relieved of all duties at Hyman-Michaels.

### B.

Joseph also claims that Ralph and Everett never told him that they had decided to retain a professional financial firm to locate a purchaser for the Company. On January 5, 1976, Charles Aaron met briefly with James Hemphill and James Gorter of the investment firm of Goldman, Sachs & Co. ("Goldman, Sachs"). Aaron told Gorter only that he represented a company that might be interested in seeking a buyer. On January 24, 1976, Ralph told Littlejohn that Hyman-Michaels was considering retaining Goldman, Sachs. As it turned out, the Company never retained Goldman, Sachs or any other investment firm.

### C.

The third alleged misrepresentation concerns Ralph's contact with Angus Littlejohn in London on the 23rd and 24th of January. Prior to his departure for Europe, Ralph told Joseph that he (Ralph) would try to reactivate interest in a purchase of Hyman-Michaels and promised to report any such interest to Joseph. On January 23, 1976, while in London, Ralph telephoned Angus Littlejohn and told him that Hyman-Michaels was no longer negotiating with Commercial Metals. Ralph asked Littlejohn if ICM and John Samuels were still interested in buying Hyman-Michaels. At Littlejohn's request, Ralph agreed to stay in London an extra day and meet Littlejohn for lunch.

After his telephone conversation with Ralph, Littlejohn sent the following telex to John Samuels in New York:

RALPH MICHAELS OF HYMAN MICHAELS COMPANY CHICAGO, WHOM I AM SEEING TOMORROW,

JUST TOLD ME THAT THE PRO-POSED SALE OF THEIR COMPANY COLLAPSD [sic] RECENTLY AT THE VERY LAST MINUTE.

I PRESUME THAT WE [ICM] WOULD NOT BE INTERESTED AT THIS STAGE BUT WOULD APPRECIATE YOUR OPINION AS TO WHETHER IT MIGHT APPEAL TO DAVID.

IF THIS IS TO BE PURSUED PLEASE GIVE ME TIME TO FIRST ESTABLISH A POSITION AS BROKER WITH RALPH.

"David" referred to David Lloyd-Jacob, the executive director of Consolidated Gold Fields in North America ("Consolidated") and the president of Azcon Corporation ("Azcon"), who had toured Hyman-Michaels's Hegewisch yard with Ralph in 1974. By telex dated January 24, 1976, but not received by Littlejohn until January 26, 1976, Samuels responded, stating that Lloyd-Jacob "would definitely be interested" but that Samuels first wanted the chance for ICM to buy Hyman-Michaels.

On January 24, 1976, Ralph had lunch with Littlejohn. Ralph repeated what he had told Littlejohn the day before and identified Goldman, Sachs as the investment banker Hyman-Michaels intended to retain. Littlejohn mentioned a number of companies that he thought might be interested in acquiring Hyman-Michaels, including Consolidated. Littlejohn then asked Ralph to exclude those companies—including Consolidated—from any agreement Ralph might reach with Goldman, Sachs so that Littlejohn could obtain a brokerage fee if he were able to effect the purchase of Hyman-Michaels by one of those companies. Ralph told Littlejohn: "Get your ducks lined up."

On January 26, 1976, Ralph had a luncheon meeting with Everett and Hyman-Michaels's lawyers, Aaron and Chapman. Ralph told the others about his meeting with Littlejohn and described the companies, including Consolidated, that Littlejohn had indicated were potential purchasers of Hyman-Michaels. Joseph—still a stockholder, officer, and director of Hyman-Mi-

chaels—was not invited. Ralph told those gathered that Littlejohn was going to contact certain companies, including Consolidated, on behalf of Hyman-Michaels. The next day, still without telling Joseph of Ralph's conversations with Littlejohn, Ralph and Everett signed the agreement to buy Joseph's stock. In July, 1976, Ralph and Everett sold the Company's name and assets to Azcon for $13.4 million and lifetime employment contracts.

## II.

Section 10(b) and Rule 10b-5 make it unlawful to misrepresent or fail to disclose material information in connection with the purchase or sale of securities. See 15 U.S.C. § 78j(b) (1982); 17 C.F.R. 240.10b-5 (1984); Affiliated Ute Citizens of Utah v. United States, 406 U.S. 128, 150-54, 92 S.Ct. 1456, 1470-72, 31 L.Ed.2d 741 (1972). The defendants argue that the jury verdict on the section 10(b) and Rule 10b-5 claim must be overturned because the information withheld from Joseph was immaterial as a matter of law, because there was no evidence of scienter, and because Joseph did not rely on Ralph's alleged misstatement about the bank. The standard for determining whether the district court should have granted a judgment notwithstanding the verdict ("j.n.o.v.") is "whether the evidence presented, combined with all reasonable inferences permissibly drawn therefrom, is insufficient to support the verdict when viewed in the light most favorable to the party against whom the motion is directed." Syvock v. Milwaukee Boiler Manufacturing Co., 665 F.2d 149, 153 (7th Cir.1981).

## A.

For purposes of section 10(b) and Rule 10b-5, an omission or misstatement is material if there is a "substantial likelihood that, under all the circumstances, the omitted [or misstated] fact would have assumed actual significance in the deliberations of the reasonable shareholder." TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449, 96 S.Ct. 2126, 2132, 48 L.Ed.2d 757

(1976); *see Sundstrand Corp. v. Sun Chemical Corp.*, 553 F.2d 1033, 1040 (7th Cir.), *cert. denied*, 434 U.S. 875, 98 S.Ct. 225, 54 L.Ed.2d 155 (1977). The materiality of the information misstated or withheld is determined in light of what the defendants knew at the time the plaintiff committed himself to sell the stock, in this case by signing the agreement to sell on January 27, 1976. *See Radiation Dynamics, Inc. v. Goldmuntz*, 464 F.2d 876, 891 (2d Cir. 1972) (commitment to sell occurs when "the parties obligated themselves to perform what they agreed to perform even if the formal performance of their agreement is to be after a lapse of time"); *see also Goodman v. Epstein*, 582 F.2d 388, 411–12 (7th Cir.1978) (quoting *Radiation Dynamics* with approval but distinguishing it on the facts), *cert. denied*, 440 U.S. 939, 99 S.Ct. 1289, 59 L.Ed.2d 499 (1979). Thus activities occurring after January 27, 1976 are relevant to the materiality issue only to the extent that they reflect what Ralph or Everett knew at the time they signed the stock purchase agreement.[2]

■ The defendants-appellants argue that under this objective test of materiality the discussions with Goldman, Sachs and Angus Littlejohn were immaterial as a matter of law. They base their argument on several cases that held that preliminary merger negotiations are immaterial as a matter of law. For example, in *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 757 (3d Cir.1984), *cert. denied*, — U.S. ——, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985), the Third Circuit held that merger negotiations do not become material until the merging companies agree on both price and the post-merger structure. *See also Reiss v. Pan American World Airways, Inc.*, 711 F.2d 11, 14 (2d Cir.1983). We note, however, that a number of cases do not apply a "bright line" rule of materiality for merger negotiations. *See SEC v. Geon Industries, Inc.*, 531 F.2d 39, 47–48 (2d Cir.1976) (balancing the probability that an event will occur and the magnitude of the event); *SEC v. Shapiro*, 494 F.2d 1301, 1305–07 (2d Cir.1974) (balancing approach); *see also Schlanger v. Four-Phase Systems, Inc.*, 582 F.Supp. 128, 131–34 (S.D.N.Y.1984); *SEC v. Gasper*, [Current] Fed.Sec.L.Rep. (CCH) ¶ 92,004 (S.D. N.Y.1985) (mere existence of merger negotiations is material when company founder had never previously considered selling his shares); *In re Carnation Co.*, Exch.Act. Rel. No. 22214 (July 8, 1985), *reprinted in* [Current] Fed.Sec.L.Rep. (CCH) ¶ 83,801, at 87,595–97 (public denial of takeover rumors was material even though parties had had only one meeting and several telephone conversations).

We need not decide whether to adopt the Third Circuit's "price and structure" standard of materiality because the policy underlying that standard is not applicable on the facts of this case. The Third Circuit based the *Greenfield* holding on the theory that disclosing preliminary merger negotiations would cause speculative investment in the target company's stock, thus raising the price. If the merger negotiations subsequently fail—as they frequently do—the

---

**2.** The appellants also assign as error the district court's refusal to give their proposed instructions 9 and 10. Proposed instruction 9 stated, in part, that the jury "should not … determine the materiality of any omitted fact based on matters occurring after 1–27–76." Instruction 10 stated, in part, "Unless defendants had knowledge of material inside information on or prior to the commitment date, they were under no duty to the plaintiff to make any disclosure to the plaintiff or to abstain from buying the plaintiff's stock." We believe the trial court properly refused to give defendants' instruction 9 because, as we hold above, matters happening after January 27, 1976 were relevant to the extent that they reflect what defendants knew on January 27. As for instruction 10, we think

the jury received the equivalent instruction from the trial judge when he told the jury:

> In order for the defendants' alleged misstatements and omissions to have been material within the meaning of the securities laws, they must have occurred in connection with the sale of his Hyman-Michaels stock. Thus, in order to satisfy the 'in connection with' requirement, the misstatements and omissions must have been known to the purchaser and must have occurred on or prior to Joseph's executing the contract on January 27, 1976.

*See Beard v. Mitchell*, 604 F.2d 485, 497–98 (7th Cir.1979) (no error if requested instruction is given "in substance").

price of the target company's stock falls; investors who bought shares at inflated, post-disclosure prices suffer a loss and shareholders who would have otherwise sold may find that they can no longer obtain even the pre-disclosure price. *See Greenfield v. Heublein, Inc.*, 575 F.Supp. 1325, 1336 (E.D.Pa.1983), *aff'd*, 742 F.2d 751 (3d Cir.1984), *cert. denied*, — U.S. —, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985). Therefore, to avoid any misleading caused by disclosing that a company is discussing merger possibilities, both the Third Circuit and a panel of the Second Circuit have held that the existence of preliminary merger negotiations is immaterial as a matter of law. *See Reiss*, 711 F.2d at 14; *Staffin v. Greenberg*, 672 F.2d 1196, 1205–07 (3d Cir. 1982). The need to protect shareholders from potentially misleading disclosure of preliminary merger negotiations, the courts reason, outweighs the right of shareholders to have notice of corporate developments important to their investment decisions. *Greenfield*, 742 F.2d at 756. As the Second Circuit noted, "[w]e have no doubt that had [the company] disclosed the existence of negotiations ... and had those negotiations failed, we would have been asked to decide a section 10b–5 action challenging that disclosure." *Reiss*, 711 F.2d at 14. The reasons for "price and structure" standard of materiality disappear when there is no public market for a shareholder's stock. Both parties agree that in 1975 Joseph, Ralph, or Everett could dispose of his stock only if Hyman-Michaels bought it back or some outside entity bought the entire Company. Since there was no public market where one of the three could sell the minority interest that he owned or controlled, there was no possibility that disclosing the contacts with Goldman, Sachs and with Littlejohn would result in speculative investment in Hyman-Michaels's stock. Furthermore, Ralph and Everett did not need to make a public announcement in order to inform all the stockholders; they merely had to tell Joseph, who was there with them on January 27, 1976 and about to sell them his stock. There was also no danger that disclosure would mislead Joseph. If Joseph had a question about what Littlejohn or Goldman, Sachs said, he could simply ask Ralph and Everett and they could clarify any possibly misleading statement. Thus Joseph had a right as a shareholder to know about corporate developments, but there was no offsetting need to protect other shareholders and investors from potentially misleading disclosure. *Cf. Staffin*, 672 F.2d at 1205–07. We therefore decline to apply the "price and structure" rule of *Greenfield* in this case.

 Although we agree with the appellee that preliminary merger negotiations may be material when there is no public market for the company's stock, we disagree with his suggestion that a more subjective standard of materiality applies when the corporation is closely-held.[3] *TSC Industries* teaches that the test of materiality is always an objective one. 426 U.S. at 445, 96 S.Ct. at 2130; *see also Kohler v. Kohler Co.*, 319 F.2d 634, 642 (7th Cir. 1963). Even with the objective test, however, the fact that the corporation is small and closely-held may affect the materiality of an omitted fact in two respects. First, an event of a given magnitude probably has a larger potential impact on the fortunes of a small company than on the fortunes of a large one. *See SEC v. Geon Industries, Inc.*, 531 F.2d at 47–48. In addition, what the reasonable shareholder considers important is necessarily a function of his options. The "total mix" of information available to the reasonable shareholder includes the probability of being locked into a

---

**3.** The appellants argue that the district court erred by applying a subjective standard of materiality when it ruled on appellants' motion for a j.n.o.v. or a new trial. We agree that the district court applied an inappropriate test of materiality. Nevertheless, the court correctly instructed the jury with the objective test of materiality and applied the subjective standard only when ruling on the motion for a j.n.o.v. *See infra* pp. 1202–1203. Since we hold that the district court could not have granted a j.n.o.v. under the objective standard, the district court's error is not reversible.

minority interest of an unprofitable, closely-held corporation. *See, e.g., Thomas v. Duralite Co.*, 524 F.2d 577, 581, 584–85 (3d Cir.1975) (defendant gave plaintiff the impression that the company faced imminent disaster). Thus, although we apply the objective standard of materiality, the significance the reasonable shareholder would give a particular omitted fact depends on the circumstances confronting him. *See TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132 ("a substantial likelihood that, *under all the circumstances*, the omitted fact would have assumed actual significance in the deliberations of the reasonable shareholder") (emphasis added); *see also* 5A A. JACOBS, LITIGATION AND PRACTICE UNDER RULE 10b–5 § 61.02[b][ii], at 3–131 (2d ed. revised December, 1984) ("the hypothetical reasonable man should be presumed to be standing in the plaintiff's shoes").

On January 27, 1976, Joseph had only two options—he could sell his stock to the Company for $300 per share or he could hope that some outside entity would buy Hyman-Michaels at a higher price. If Joseph had decided not to sell and no other company acquired Hyman-Michaels, Joseph would have been the unemployed owner of a minority interest for which there was no market and that paid no dividends. *See* Hillman, *The Dissatisfied Participant in the Solvent Business Venture: A Consideration of the Relative Permanence of Partnerships and Close Corporations*, 67 Minn.L.Rev. 1, 37–38 n. 118 (1982) (discussing the "essentially unmarketable character of minority interests in close corporations"). We therefor must consider whether the withheld information about Littlejohn and Goldman, Sachs would have assumed actual significance in the deliberations of the reasonable shareholder owning such a minority interest.

 The defendants argue that no jury reasonably could find that Hyman-Michaels's contacts with Goldman, Sachs and Ralph's conversations with Angus Little-john were material facts for purposes of Rule 10b–5. We agree that the contact with Goldman, Sachs was not a material fact. Viewing the evidence in the light most favorable to Joseph, as we must, the evidence supports a finding that Ralph and Everett sent Charles Aaron to Goldman, Sachs to discuss (without revealing Hyman-Michaels's identity) whether Goldman, Sachs would be interested in finding a buyer for a small, closely-held company. In addition, Ralph told Angus Littlejohn that Ralph and Everett were considering retaining Goldman, Sachs to find a buyer for Hyman-Michaels. Nonetheless, on January 27, Aaron had not revealed Hyman-Michaels's identity to Goldman, Sachs and Goldman, Sachs had no way to assess the Company's salability. We therefore hold that the withheld information about the contact with Goldman, Sachs was immaterial as a matter of law.

 On the other hand, a jury could reasonably find that Littlejohn's agreement to contact prospective buyers on behalf of Hyman-Michaels was material. Viewing the evidence in the light most favorable to the plaintiff, Ralph and Everett knew that Angus Littlejohn, who had visited the Company with John Samuels in September, 1975 when Samuels discussed the possibility of ICM buying Hyman-Michaels for $12 to $14 million, had agreed to contact some prospective buyers on behalf of Hyman-Michaels. Ralph's comment that Littlejohn should "get [his] ducks lined up," together with Littlejohn's actions after the January 24 meeting,[4] support a finding that Ralph retained Littlejohn as a broker on January 24, 1976. Furthermore, although Ralph thought his conversations with Littlejohn were important enough to report to Everett and the other Company officers and advisors who met on January 26, 1976, neither Ralph nor Everett told Joseph, the only other major stockholder, about these developments.[5] See *SEC v. Texas Gulf Sulfur Co.*, 401 F.2d 833, 851 (2d Cir.1968) ("[A]

---

4. *See infra* pp. 1200–1201.

5. There were other stockholders besides Ralph, Everett, and Joseph, but Ralph and Everett controlled the stock of these other stockholders.

major factor in determining whether the [information] was a material fact is the importance attached to the [information] by those who knew about it."), *cert. denied sub nom. Coates v. SEC*, 394 U.S. 976, 89 S.Ct. 1454, 22 L.Ed.2d 756 (1969). Finally, Ralph and Everett refused Joseph's request that the stock purchase agreement be signed on January 27 but the closing be delayed six weeks so that Joseph might be able to complete his negotiations with the Harris Bank and buy the Company from Ralph and Everett. They did not, Ralph testified, want to give Joseph an extension that "might interfere with any future plans [they] may have for the sale of Hyman-Michaels." In short, a jury could reasonably find that on January 27 Ralph and Everett knew—but did not disclose to Joseph—that the prospects for selling Hyman-Michaels were the brightest since the Commercial Metals negotiations had collapsed. To the reasonable shareholder standing in Joseph's shoes, this would clearly be a material fact.

The defendants also argue that the withheld information was immaterial as a matter of law because Joseph knew that Hyman-Michaels was for sale and he knew that Ralph had gone to Europe to "stir up" interest in Hyman-Michaels. Ralph had promised, however, to tell Joseph of any developments in Europe. In light of this promise, we think a reasonable shareholder would interpret Ralph's failure to mention any developments—especially since Al Moeng told Joseph that "nothing" happened in Europe—as a sign that Ralph had no success. This fact distinguishes the present case from *Hassig v. Pearson*, 565 F.2d 644, 649–50 (10th Cir.1977). In *Hassig*, the Tenth Circuit held that the majority shareholder of a bank need not disclose general inquiries about purchasing the bank since he told the minority shareholder that he (the majority shareholder) was thinking about retiring and selling his majority interest. *Id.* at 649. Thus in *Hassig* the majority shareholder disclosed that he intended to end his many years as majority owner and officer of the bank and sell his interest. Here Ralph and Everett

disclosed neither their proposed change in approach (using Littlejohn as a broker) nor the prospects that Littlejohn would contact on behalf of Hyman-Michaels. Knowledge that Hyman-Michaels was for sale would not aid the reasonable shareholder's deliberations if the shareholder did not know about the change in approach or the brightened prospects.

The defendants' reliance on *James Blackstone Memorial Library Association v. Gulf, Mobile and Ohio Railroad*, 264 F.2d 445 (7th Cir.), *cert. denied*, 361 U.S. 815, 80 S.Ct. 56, 4 L.Ed.2d 62 (1959) is also misplaced. In that case, minority shareholders complained that the majority shareholder failed to disclose its intent to sell some of the company's assets at a favorable price. *Blackstone* was unique, however, in that the company had leased all its assets to another company in perpetuity. In exchange, the lessee promised to pay an annual dividend of $7 per share on the lessor's stock. The special master found, and this court agreed, that even if the minority shareholders had not sold their stock, they would still receive only the $7 annual dividend and would not have enjoyed any increase in the value of their stock. *Id.* at 452–53. Since the sale of assets would have no effect on the value of the stock, knowledge of the prospective sale would not alter the "total mix" of information considered by the reasonable shareholder. In contrast, the shareholders of Hyman-Michaels would—and did—enjoy the profits of selling the Company's assets for more than their book value.

For these reasons, a reasonable jury could find that, under all the circumstances, there was a substantial likelihood that the withheld information about Littlejohn would have assumed actual significance in the deliberations of the reasonable shareholder. *TSC Industries*, 426 U.S. at 449, 96 S.Ct. at 2132. The defendants were therefore not entitled to a judgment notwithstanding the verdict on the ground that no reasonable jury could find the omission material. *Selle v. Gibb*, 741 F.2d 896, 900 (7th Cir.1984).

### B.

To prevail on a section 10(b) or Rule 10b–5 claim, a plaintiff must also prove scienter—an intent to deceive. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–14, 96 S.Ct. 1375, 1390–91, 47 L.Ed.2d 668 (1976). Since defendants argue that there was no evidence of scienter, we examine the record to determine whether a jury could reasonably find that Ralph and Everett knowingly or recklessly withheld (or misstated) material information. *See Sanders v. John Nuveen & Co.*, 554 F.2d 790, 792–93 (7th Cir.1977).

The defendants argue there was no evidence of scienter because Ralph thought the bank said "no" and because Ralph and Everett did not think the withheld information about Littlejohn was important. We quickly dismiss the first argument because Ralph testified at trial that Simons (the Continental Bank loan officer) told him the bank would not loan the $3 million or the $4 million unless Ralph gave a personal guarantee. Ralph also testified that he told Everett the bank wanted Ralph's personal guarantee but only told Joseph that the bank said "no" and that Joseph was "out" of Hyman-Michaels. Since the evidence clearly supported a finding that Ralph knowingly misstated the bank's answer, a jury could reasonably infer that Ralph intended to deceive Joseph with the falsehood. *Cf. Sanders*, 554 F.2d at 792.

The plaintiff also offered sufficient evidence for a jury to find that the defendants possessed scienter with respect to the omissions. Ralph thought his discussions with Littlejohn were important enough to report to Everett and the Company's lawyers at their January 26 meeting. Nonetheless, neither Ralph nor Everett mentioned Littlejohn when they met with Joseph to buy his stock on January 27.

A finding of scienter is also supported by Ralph and Everett's January 27 refusal to extend the closing date beyond January 30. True, it is the date the parties sign the agreement, not the closing date, that is relevant for determining materiality and scienter. *See Radiation Dynamics*, 464 F.2d at 891. But their refusal to extend the closing date and the subsequent explanations of that refusal are relevant to prove their intent on January 27, 1976. Ralph and Everett knew that Joseph and Fuerst had met with the Harris Bank and were trying to obtain a loan so Joseph could buy Hyman-Michaels. They refused to extend the closing date because, as Ralph testified, allowing Joseph a six-to-eight week extension for the purpose of allowing Joseph to obtain financing "might interfere with any future plans" for the sale of Hyman-Michaels. Therefore, viewing the facts in the light most favorable to the plaintiff, we think a jury could reasonably find that Ralph and Everett possessed the requisite scienter when they purchased Joseph's stock on behalf of the Company. *See Herman & MacLean v. Huddleston*, 459 U.S. 375, 390 n. 30, 103 S.Ct. 683, 692, 74 L.Ed.2d 548 (1983) (scienter can be inferred from circumstantial evidence).

### C.

Finally, appellants assert that the judgment for the plaintiff must be reversed because Joseph's claim cannot satisfy the reliance element of a section 10(b) claim. The defendants contend that Joseph failed to prove he had relied on Ralph's misstatement about the bank and that they proved that Joseph would have sold his stock for $300 a share even if he had known about Littlejohn.

When a plaintiff bases a section 10(b) or a Rule 10b–5 claim on a misrepresentation, he must prove that he was induced to act by the defendant's misstatement. *See Huddleston v. Herman & MacLean*, 640 F.2d 534, 547–48 (5th Cir.), *modified*, 650 F.2d 815 (5th Cir.1981), *aff'd in part and rev'd in part on other grounds*, 459 U.S. 375, 103 S.Ct. 683, 74 L.Ed.2d 548 (1983). The defendants in this case claim that Joseph's theory of reliance is premised on a fact that was contradicted by the proof. They argue that Joseph offered no credible evidence of reliance and that he therefore cannot succeed on the misrepresentation claim. We disagree. Joseph tes-

tified at trial that he would not have agreed to sell his stock for $300 per share if he had known that Continental Bank did not say "no" to the request for a loan to buy both Everett's and Joseph's stock. In addition, Joseph's attempt to obtain financing from the Harris Bank so he could buy Hyman-Michaels—an attempt that continued until he sold his stock—suggests that Joseph believed Ralph's statement and, consequently, looked for alternative methods of protecting his minority interest in the Company. From this evidence, a jury could reasonably find that Ralph's statement that the bank said "no" was relied upon by Joseph in his decision to forego his request that his stock be bought with Everett's and instead to sell only his stock to the Company.

■■■■■■ Turning to the withheld information about Littlejohn, we note that reliance is presumed when the plaintiff proves that the withheld information was material. See *Affiliated Ute Citizens*, 406 U.S. at 153–54, 92 S.Ct. at 1472; *Wright v. Heizer Corp.*, 560 F.2d 236, 249 (7th Cir. 1977), *cert. denied*, 434 U.S. 1066, 98 S.Ct. 1243, 55 L.Ed.2d 767 (1978). A defendant can still prevent a plaintiff from recovering, however, if the defendant can prove that the plaintiff did not rely, that is, "that even if the material facts had been disclosed, plaintiff's decision as to the transaction would not have been different from what it was." *Rochez Bros., Inc. v. Rhoades*, 491 F.2d 402, 410 (3d Cir.1974), *cert. denied*, 425 U.S. 993, 96 S.Ct. 2205, 48 L.Ed.2d 817 (1976). In the present case, Ralph and Everett argue that telling Joseph about Littlejohn would not have affected Joseph's decision to sell because he was heavily in debt and, "having been effectively dismissed from Hyman-Michaels on January 5," without a job. The plaintiff stipulated at trial that without his job at Hyman-Michaels he was "between a rock and a hard place." In addition, the defendants introduced into evidence memos written by Joseph's banker that stated that in January, 1976 Joseph owed approximately $195,000 to the First National Bank of Chicago and approximately $50,000 to the Mar-

ina City Bank. These memos are far from the conclusive proof that the defendants claim them to be; two of these memos also stated that Joseph owned approximately $225,000 in liquid, non-Hyman-Michaels securities. Since the omissions were material, the defendants bore the burden of proving no reliance, *see Huddleston*, 640 F.2d at 548, and we do not think that they conclusively proved that Joseph had no choice but to sell his stock for $300 per share on January 27, 1976. Viewing the evidence in the light most favorable to the plaintiff, a jury could reasonably find that, even though Joseph was "between a rock and a hard place," he would have postponed signing the agreement or demanded a higher price if he had known about the contacts with Littlejohn.

### III.

Appellants challenge several evidentiary rulings made by the trial court. They claim that the trial court erred in admitting (1) evidence concerning Littlejohn's activities after his luncheon meeting with Ralph Michaels on January 24, 1976; (2) telexes sent by Littlejohn to Samuels and responses by Samuels; and (3) testimony about the January 28, 1976 telephone conversation between Ralph and Littlejohn. According to defendants, all of this evidence is irrelevant and highly prejudicial and the telexes are also inadmissible hearsay. The defendants also challenge the exclusion of some of their evidence on the damages issue.

■■■■ Evidence is relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Fed.R.Evid. 401. A district court can, in its discretion, exclude relevant evidence if the probative value of the evidence "is substantially outweighed by the danger of unfair prejudice." Fed.R.Evid. 403. On appeal, we accord "great deference" to the district court's decision on admissibility. *See United States v. Medina*, 755 F.2d 1269, 1274 (7th Cir.1985).

In the present case, the plaintiff offered evidence of Littlejohn's activities after January 24, 1976 to prove that Ralph and Littlejohn agreed at the January 24 luncheon that Littlejohn would act as a broker for Hyman-Michaels. Littlejohn's activities, the plaintiff argued, revealed that Littlejohn acted as if he were the Company's broker and are therefore consistent with Joseph's contention that Ralph and Littlejohn reached an agreement on January 24. This theory of admissibility also supports the relevance of the telex Littlejohn received from Samuels on January 26, 1976. Rather than follow Samuels's instruction to explore whether ICM could purchase Hyman-Michaels, Littlejohn instead contacted Dov Gottesman, an industrialist Littlejohn had mentioned to Ralph on January 24, 1976. Littlejohn's response to the telex thus suggests that he was more concerned with the sale of Hyman-Michaels than with any potential benefit to ICM. Consequently, we think the probative value of the evidence clearly outweighed any danger of unfair prejudice.

As for the other evidence, the January 23, 1976 telex to Samuels described Littlejohn's phone conversation with Ralph and Littlejohn's intention to establish himself as a broker for Hyman-Michaels. Thus the telex is relevant as it shows the course of action leading up to the alleged January 24 agreement. The district court also found Littlejohn's phone conversation with Ralph on January 28, 1976 and the subsequent telex to Samuels tended to confirm or clarify the agreement made on January 24. The court concluded that even though these communications occurred after the January 27 signing of the agreement, they were relevant and admissible because they tended to make the existence of a January 24 agreement more probable than it would be without this evidence. Balancing the probative value and the danger of unfair prejudice of evidence is within the discretion of the trial court, and we do not think the court abused its discretion.

The defendants also argue that the telexes were inadmissible hearsay. At trial, the plaintiff countered that the telexes by Littlejohn were admissible under Fed. R.Evid. 801(d)(2)(D) (statement by an agent of the party) and that the January 23, 1976 telex from Samuels was not offered to prove the truth of the matter asserted. We think the telexes sent by Littlejohn after his lunch with Ralph are not hearsay because, even if a broker is not an agent for purposes of Rule 801(d)(2)(D), Littlejohn's statements concerned the possible sale of Hyman-Michaels. Viewing the other evidence in the light most favorable to the plaintiff, Ralph authorized Littlejohn to act as the Company's broker and contact Samuels and other potential buyers. Thus these telexes are statements by a person authorized to make a statement about the subject and are admissible under Fed.R. Evid. 801(d)(2)(C). Of course, the plaintiff does not claim that Ralph authorized Littlejohn to act for Hyman-Michaels on January 23, 1976, so Littlejohn's telex of that date cannot be admitted under Rule 801(d)(2)(C). But Littlejohn stated in the telex "Ralph Michaels ... just told me" and, although he later equivocated, Littlejohn testified in his deposition (which was read at trial) that he sent the telex "immediately" after his conversation with Ralph. Therefore, although the district court did not give a reason why he overruled the hearsay objection, the court would not have abused its discretion by admitting it as a present sense impression under Fed.R.Evid. 803(1).

Turning to the telexes from Samuels, we believe the district court correctly admitted the telex sent on January 23, 1976 and received by Littlejohn on January 26, 1976. As we noted in discussing its relevance, the plaintiff argued that the telex was offered not to prove that David Lloyd-Jacob was interested or that Samuels thought ICM should buy Hyman-Michaels but rather to show Littlejohn's response to this information. Thus the first telex from Samuels, because it was not offered to prove the truth of the matter asserted, was not hearsay. Fed.R.Evid. 801(c). The telex from Samuels to Littlejohn on January 28, 1976, which stated "Proceed with con-

tact of Lloyd-Jacob," appears to be hearsay and not within any exception. To the extent the district court erred in admitting this evidence, we find the error harmless. Fed.R.Civ.P. 61.

■■■ Finally, the defendants argue that the district court erred in excluding evidence about events occurring after Joseph sold his stock but affecting the final liquidation value of Evra Corporation stock.[6] Plaintiff's expert, Howard Doherty, testified that a post-January 27, 1976 event, the sale of Hyman-Michaels's assets to Azcon, affected the value of Joseph's stock on January 27, 1976. The defendants then tried to ask one of their expert witnesses, Carl Ruzicka, about events occurring between July, 1976 and October, 1983 that affected the liquidation value of Evra Corporation. The plaintiff objected, claiming that Ruzicka should not be permitted to testify about expenses incurred by Evra in defending the present lawsuit. The plaintiff also contended, and the district court seemed to agree, that Joseph could not be charged with management decisions occurring after January 30, 1976 that affected the value of the stock. The district court did, however, allow Ruzicka to testify that, after Evra Corporation liquidated its assets and liabilities, approximately $8.6 million, or $427.65 a share, was distributed to the shareholders. We think the district court did not abuse its discretion in excluding evidence of events occurring between July, 1976 and October, 1983. The court could reasonably find that the danger of confusion or unfair prejudice substantially outweighed the probative value of testimony about events occurring as late as six and one-half years after Joseph sold his stock. *See Medina*, 755 F.2d at 1274 (district court ruling is given "great deference").

### IV.

■■■ Ralph and Everett argue that the trial court should have granted them a new trial. Since a motion for a new trial is addressed to the sound discretion of the trial court, we may reverse the trial court's decision only for an abuse of discretion. *See Spesco, Inc. v. General Electric Co.*, 719 F.2d 233, 240 (7th Cir.1983).

The defendants first argue that we should reverse the district court's denial of their motion for a new trial because that court applied the more stringent judgment notwithstanding the verdict standard when ruling on their motion. As the defendants correctly point out, the court's order used the language of the j.n.o.v. standard in rejecting the defendants' argument that the withheld and misrepresented information was not material. Nevertheless, we do not believe the court erred.

The defendants flooded the district court with thirty-four reasons, not counting subparts, why the district court should grant a j.n.o.v. or, in the alternative, a new trial. In its order disposing of the motion, the district court stated that only a few of these numerous arguments warranted discussion. The court then summarized the defendants' argument on materiality as follows: "Defendants contend the court should have ruled as a matter of law that the enumerated omissions and misrepresentations were not material to the plaintiff's investment decision." Nothing in the district court's discussion of the issue suggests that the district court denied the motion for new trial on the ground that the defendants could not meet the j.n.o.v. standard. Instead, it appears that, since the defendants stressed in their memorandum in support of the motion that the information was immaterial *as a matter of law,* the district court decided that the issue whether the true information was immaterial as a matter of law warranted discussion but that whether the verdict was against the clear weight of the evidence did not. This explanation seems especially likely since the district court used language appropriate for deciding a motion for a new trial in discussing the defendants' argu-

---

**6.** As part of the sale of assets to Azcon, Hyman-Michaels sold its name to Azcon and changed its corporate name to Evra Corporation.

ments that inconsistent verdicts, inflammatory comments in closing argument, and an excessive damage award necessitated a new trial. It seems highly improbable that in one order the district court would apply the wrong standard for a new trial motion in discussing the first issue and then apply the correct standard for the remaining issues. We believe the district court concluded that the defendants' argument for a new trial did not justify discussion. Having reviewed the record, we conclude that there was evidence sufficient to support a finding of materiality and therefore the district court did not abuse its discretion in denying the defendants' motion for a new trial on this ground. *See Rey v. City of Fredericktown, Missouri*, 729 F.2d 1171, 1174 (8th Cir.1984).

■ Nor did the district court abuse its discretion in rejecting the defendants' arguments that inconsistent verdicts and inflammatory comments in closing argument mandated a new trial. The district court instructed the jury that Hyman-Michaels Company was responsible for any act or omission of an officer or employee within the scope of his employment. The jury verdicts against Ralph and Everett but in favor of the Company were consistent, as the district court reasoned, because the jury could have found that Ralph and Everett acted for their personal benefit and not in their corporate capacities. Evidence that the Hyman-Michaels Board of Directors never passed a resolution concerning the consent agreement or authorizing Marvin Chapman to reject Joseph's proposals on January 4, 1976 and January 27, 1976 supports this conclusion.

■ As to the alleged inflammatory comments by plaintiff's counsel in closing argument, the comments do not constitute fundamental trial error and therefore defense counsel's failure to object precludes the defendants from assigning the comments as error. *See Gonzalez v. Volvo of America Corp.*, 752 F.2d 295, 298 (7th Cir. 1985). As we stated in *Gonzalez*, "risky gambling tactics such as [not objecting] are usually binding on the gambler." *Id.* This is especially true in the present case, since the defense counsel not only failed to object but also said in his opening argument that Joseph had "abandoned and deserted" his first wife and called Joseph "sly, avaricious, and greedy" in both his opening and closing arguments. The defendants gambled on a trial strategy and lost, and the district court did not abuse its discretion in refusing to grant a new trial for comments to which the defendants did not object.

■ Finally, the defendants argue that the plaintiff offered no credible evidence to support the jury's award of $750,000 in compensatory damages and $200,000 in punitive damages. Howard Doherty, the plaintiff's damages expert, testified that he estimated the value of Joseph's stock as $1,823,011, or $915,928 more than Joseph received. He obtained this estimate by starting with $9,397,490, the book value (or shareholders' equity) for common stock and convertible debentures. To this figure he added the gain on the sale of assets to Azcon ($3,391,486) and the actuarial value of Ralph's and Everett's lifetime employment contracts with Azcon ($382,681). Doherty testified that under this approach Joseph's stock was worth $600.27 a share rather than the $300 he received.

The trial court stated in its order denying the motion for a new trial that the "court, and apparently the jury, found plaintiff's expert to be credible in arriving at a damage figure." True, the jury awarded $750,000 rather than the $915,928 Doherty estimated, but the jury was not bound by Doherty's estimate and was entitled to make its own estimate of damages. In any event, the verdict does not suggest "a runaway jury or one that lost its head" and therefore the district court did not abuse its discretion in denying a new trial on compensatory damages. *See Grunenthal v. Long Island Railroad*, 393 U.S. 156, 160, 89 S.Ct. 331, 334, 21 L.Ed.2d 309 (1968); *Spesco*, 719 F.2d at 240–41.

■ With respect to punitive damages, the defendants argue that the court should not have submitted the issue to the

jury because the record contains no credible evidence of willful and wanton conduct. We disagree. Under Illinois law, the function of punitive damages is to punish the wrongdoer and deter both him and others from committing like offenses in the future. *See Kelsay v. Motorola, Inc.*, 74 Ill.2d 172, 188, 23 Ill.Dec. 559, 566, 384 N.E.2d 353, 360 (1978). Thus Illinois courts have long recognized that punitive damages are appropriate when torts are committed with fraud or actual malice or when the defendant acts willfully or with a wanton disregard for the rights of others. *Id.* at 186, 23 Ill.Dec. 559, 384 N.E.2d 353. In the present case, the plaintiff offered evidence showing, among other things, that Ralph lied to Joseph about the bank loan, that Joseph was "out" of Hyman-Michaels as far as Everett and Ralph were concerned, that Everett and Ralph withheld information about Angus Littlejohn, and that Everett and Ralph refused to give Joseph more time to negotiate a loan so Joseph could buy the Company. If believed, this evidence supports a finding that Everett and Ralph intentionally defrauded Joseph and justifies an award of punitive damages. *See Durant v. Surety Homes Corp.*, 582 F.2d 1081, 1088 (7th Cir.1978) ("the transcript of a trial in a fraud case will seldom reveal admissions by the defendant that his conduct was not only fraudulent but intentionally, willfully, or recklessly so"). Therefore the district court properly submitted the issue to the jury and the court did not abuse its discretion in denying the motion for a new trial. We similarly refuse to substitute our judgment for that of the jury. *See McGrath v. Zenith Radio Corp.*, 651 F.2d 458, 474 (7th Cir.), *cert. denied*, 454 U.S. 835, 102 S.Ct. 136, 70 L.Ed.2d 114 (1981).

### V.

▆▆▆ Prejudgment interest is a form of compensation and the decision to award prejudgment interest rests in the sound discretion of the district court. *See Myron v. Chicoine*, 678 F.2d 727, 733–34 (7th Cir. 1982); *Sanders v. John Nuveen & Co.*, 524 F.2d 1064, 1075 (7th Cir.1975), *vacated and remanded on other grounds*, 425 U.S. 929, 96 S.Ct. 1659, 48 L.Ed.2d 172 (1976). That decision requires a balancing of the equities between the parties under the circumstances of the particular case. *Myron*, 678 F.2d at 734. In the present case, defendants challenge the award of prejudgment interest on the grounds that Joseph is responsible for part of the delay and that a juror stated in an affidavit that the $750,000 award included prejudgment interest.

▆▆▆▆ The defendants suggest that the court should not have assessed interest against them for the time between Joseph's loss and the date he filed his complaint in this lawsuit. They cite no case authority for this proposition, however, and our research has uncovered no cases. Indeed, this court has awarded prejudgment interest from the date of the loss. *See Sundstrand*, 553 F.2d at 1051; *see also Sanders*, 524 F.2d at 1075 ("unless the plaintiff is paid interest for the entire time that he is deprived of the use of his money, he will not receive full compensation"). Although Joseph did wait more than two years before filing his complaint, the district court specifically found that "the extended delay [more than eight years] between the loss and final judgment was not caused by any dilatory tactics by the plaintiff" and that there were "no countervailing equitable considerations making the award unfair to the defendants." A plaintiff's delay in filing an action, and the reason for the delay, may be considered by the district court when balancing the equities and awarding prejudgment interest. In the present case, we believe the district court properly balanced the equities and did not abuse its discretion in awarding prejudgment interest from the date of Joseph's loss.

▆▆▆ The defendants also challenge the district court's refusal to consider a juror's affidavit that said the jury had included prejudgment interest in the $750,000 compensatory damages award. Defendants argue that, since an award of prejudgment interest is based on fairness and equitable considerations, the district court should

have considered the affidavit. We disagree.

Rule 606(b)[7] of the Federal Rules of Evidence precludes a juror from testifying about jury deliberations. This rule was designed to protect the jury's deliberative process—including jurors' statements, mental and emotional reactions, and votes. Fed.R.Evid. 606(b); *Wiedemann v. Galiano*, 722 F.2d 335, 337 (7th Cir.1983). As the Supreme Court stated, if jurors were competent to impeach their verdict, they "would be harassed and beset by the defeated party in an effort to secure from them evidence of facts which might establish misconduct sufficient to set aside a verdict." *McDonald v. Pless*, 238 U.S. 264, 267–68, 38 S.Ct. 783, 784–85, 59 L.Ed. 1300 (1915). We recognize that if the affidavit is true the plaintiff will receive an undeserved bonanza in the form of the district court's award of prejudgment interest. Nevertheless, we believe that allowing a juror's affidavit to influence a district court's opinion on prejudgment interest presents much the same problem as permitting an affidavit to support a motion for a new trial—a context in which we have already held a juror's affidavit to be incompetent under Rule 606(b). *See Wiedemann*, 722 F.2d at 337. The defendants' attempt to characterize part of the $750,000 as prejudgment interest is in essence an attempt to impeach the award; therefore the district court properly refused to consider the affidavit. *See Wilsmann v. Upjohn Co.*, 572 F.Supp. 242, 244–45 (W.D. Mich.1983) (juror's affidavit not considered by court when awarding prejudgment interest).

## VI.

■■■ Finally, the defendants claim that the district court should not have directed a verdict for the plaintiff on Hyman-Michaels's counterclaim. That counterclaim, which alleged that by bringing the present lawsuit Joseph had breached ¶ 7 of the January 27, 1976 agreement, sought damages to compensate the Company for the cost of defending the present action.

Although the parties agreed during trial not to offer evidence as to the amount of attorneys' fees incurred, the January 27, 1976 agreement was entered into evidence. That agreement only stated that Joseph released the Company "from any and all obligations, claims, demands, liabilities, actions, and causes of action" which Joseph then had; it made no mention of attorneys' fees or costs in the event of a breach. This omission is fatal to the Company's counterclaim since, under Illinois law, attorneys' fees and the ordinary expenses of litigation are not allowable to the successful party absent a statute or contractual agreement. *See Kerns v. Engelke*, 76 Ill.2d 154, 166–67, 28 Ill.Dec. 500, 506, 390 N.E.2d 859, 865 (1979); *Qazi v. Ismail*, 50 Ill.App.3d 271, 273, 7 Ill.Dec. 434, 436, 364 N.E.2d 595, 597 (1977). Therefore the district court properly directed a verdict for the plaintiff on the Company's counterclaim. *Cf. Ferrara v. Collins*, 119 Ill.App.3d 819, 825, 75 Ill.Dec. 319, 323, 457 N.E.2d 109, 113 (1983).

## VII.

■■■■ For the foregoing reasons, we affirm the awards of $750,000 in compensatory damages and $200,000 in punitive damages. Since we affirm these awards on the bases of the Rule 10b–5 and common-law fraud claims,[8] we need not discuss

---

**7.** That rule provides as follows:
Upon an inquiry into the validity of a verdict or indictment, a juror may not testify as to any matter or statement occurring during the course of the jury's deliberations or to the effect of anything upon his or any other juror's mind or emotions as influencing him to assent to or dissent from the verdict or indictment or concerning his mental processes in connection therewith, except that a juror may testify on the question whether extraneous prejudicial information was improperly brought to the jury's attention or whether any outside influence was improperly brought to bear upon any juror. Nor may his affidavit or evidence of any statement by him concerning a matter about which he would be precluded from testifying be received for these purposes.
Fed.R.Evid. 606(b).

**8.** The defendants direct no arguments specifically to the common-law fraud count and so we presume that they would urge reversal of the

the defendants' challenges to the jury verdict on the fiduciary duty count. We also affirm the award of prejudgment interest and the directed verdict for the plaintiff on the counterclaim. The judgment of the district court is

AFFIRMED.

fraud count for the same reasons they offer for reversal of the section 10(b) count. Under Illinois law, the elements of a cause of action for fraud are the following: (1) a false statement of material fact, (2) known or believed to be false by the party making the statement, (3) an intent to induce the other party to act, (4) action by the other party in reliance on the truth of the statement, and (5) damage to the other party as a result of that reliance. *See Soules v. General Motors Corp.*, 79 Ill.2d 282, 286, 37 Ill.Dec. 597, 599, 402 N.E.2d 599, 601 (1980). Omission of a material fact, when accompanied by scienter, deception, and injury, can also constitute fraud under Illinois law. *See Perlman v. Time, Inc.*, 64 Ill.App.3d 190, 195, 20 Ill.Dec. 831, 835, 380 N.E.2d 1040, 1044 (1978). For the reasons given in our discussion of the section 10(b) count, we hold that a jury could reasonably find the defendants liable for common-law fraud.