**Donald J. GUY, Plaintiff,**

v.

**DUFF & PHELPS, INC. and Claire V. Hansen, Defendants.**

**No. 84 C 2813.**

United States District Court, N.D. Illinois, E.D.

July 12, 1985.

James J. Moylan, Chicago, Ill., for plaintiff.

Edward C. Fitzpatrick, Chicago, C. Joseph Yast, Shelley L. Rice, Steven E. Handler, Lord, Bissel & Brook, Chicago, Ill., for defendants.

**1.** To avoid awkward repetition of "Blue Sky Law" each time that statute needs to be cited, such citations in this opinion will take the simple form "Law § —" (omitting entirely the ¶ 137 portion of the citation and including only the numbers following the decimal point, to correspond to the internal section numbering of the Blue Sky Law).

## MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Donald Guy ("Guy") charges Duff & Phelps, Inc. ("Duff & Phelps") and its Chairman of the Board and Chief Executive Officer Claire Hansen ("Hansen") violated:

1. Securities Exchange Act ("1934 Act") § 10(b) (15 U.S.C. § 78(j)) and SEC Rule 10b–5 promulgated under the 1934 Act (17 C.F.R. § 240.10b–5),

2. Illinois Securities Law of 1953 ("Blue Sky Law") § 13 A (Ill.Rev.Stat. ch. 121½, ¶ 137.13 A [1]) and

3. their common-law fiduciary duties to Guy,

as well as committing common-law fraud, when they forced Guy to sell his Duff & Phelps stock back to the company upon termination of his employment. Defendants have now moved under Fed.R.Civ.P. ("Rule") 56 for summary judgment as to all Guy's claims. For the reasons stated in this memorandum opinion and order, the motion is granted.

### Facts [2]

#### 1. Guy's Termination

Duff & Phelps is an Illinois corporation engaged in the business of providing investment research, credit ratings, financial consulting and management services. In 1978 Guy joined Duff & Phelps as a vice president responsible for developing Duff & Phelps' computer capability and for studying, teaching and implementing new methods of quantitative analysis in investment research and management.

Before joining Duff & Phelps Guy had been an assistant professor of finance at Purdue University, where he had formed

**2.** Rule 56 imposes on the party moving for summary judgment the burden of establishing the lack of a genuine issue of material fact. *Korf v. Ball State University,* 726 F.2d 1222, 1226 (7th Cir.1984). For that purpose the court must, in viewing the evidence, draw all reasonable inferences in the light most favorable to the nonmovant—here Guy. *Hermes v. Hein,* 742 F.2d 350, 353 (7th Cir.1984). Throughout this opinion the recitals of fact adhere to that principle.

his own securities investment advisory business based on a computer model. In 1981, while still employed by Duff & Phelps, Guy applied to the Commodities Futures Trading Commission to become a registered commodities trading advisor. Then he began a small commodity trading business without informing anyone at Duff & Phelps.

Guy operated the business from his home and then from an office in the basement of a friend's home (Guy Dep. 6–7, 292–94). He did some of the work at Duff & Phelps' offices between 7:00 and 7:30 a.m., before Duff & Phelps' regular business hours (*id.* at 154). Guy used Duff & Phelps' telephones and occasionally its computer in his business (*id.* at 131, 154, 171–72). By July 1983 Guy had 50 to 60 customers and managed portfolios with total assets of about $4 million (*id.* at 105–06, 108, 124). Earnings from the business exceeded $95,-000 in 1982 and $43,000 during the first 8½ months of 1983.

Duff & Phelps did not learn of Guy's business until late May or early June 1983, when Hansen questioned Guy about the early morning phone calls he received at work (Guy Dep. 148–51; Hansen Dep. 33–34). Guy told Hansen about the business and provided him with documents at his request (Guy Dep. 150–51; Hansen Dep. 35–44). About a month later Hansen told Guy he would have to abandon his own business if he wanted to stay with Duff & Phelps (Guy Dep. 163–64), giving Guy another month to think over his choice (*id.* at 164). On July 29 Guy met with Hansen again and said he would not give up his own business (Hansen Dep. 61). Hansen then fired him effective December 31, 1983. That date was later advanced to September 15, 1983 by agreement (at least in the sense Guy was given a choice between September 1 and 15) (Guy Dep. 188–89, 245).

## 2. *Guy's Duff & Phelps Stock*

As a Duff & Phelps officer, Guy had the right to purchase Duff & Phelps stock through a payroll deduction plan. He bought 200 shares under a Stock Restric-

tion and Purchase Agreement, Paragraph 7 of which required him to sell the shares back to the company at book value on his termination:

7. Upon the termination of the employment with the Corporation of any of the undersigned individuals for any reason, including resignation, discharge, death, disability or retirement, the individual whose employment is terminated or his estate shall sell to the Corporation, and the Corporation shall buy, all shares of the Corporation then owned by such individual or his estate. The price to be paid for such shares shall be equal to the adjusted book value (as hereinabove defined) of the shares on the December 31 which coincides with, or immediately precedes, the date of termination of such individual's employments.

When Guy left his employment he accordingly surrendered his shares and received their book value.

## 3. *Proposed Security Pacific Acquisition*

In 1982 Security Pacific Corporation ("Security Pacific") expressed an interest in acquiring Duff & Phelps (Richeson Dep. 9–16, 21, 24–25). After some preliminary meetings, the companies began serious negotiations in May 1983 (Jeffries Dep. 30–31, 36). At least four face-to-face bargaining sessions were held in June (*id.* at 25–27, 38). Guy and Duff & Phelps differ as to whether an agreement in principle was reached by the end of July (a subject discussed in greater detail under *Duty of Disclosure*), but in any case the anticipated purchase price of probably $50 million far exceeded the book value of Duff & Phelps' stock. No deal was consummated, and on August 11 Security Pacific cut off discussions altogether (Richeson Dep. 52, 55, 61, 265–66).

On December 1, 1983 Security Pacific rekindled discussions, and on January 10, 1984 the companies announced publicly they had agreed to an acquisition. On March 23 they executed a definitive agreement. However, the agreement was conditioned on approval of the terms by the

Federal Reserve Board. After extended delay, such approval was refused. On January 9, 1985 Security Pacific announced the deal was off.

While Guy was deciding whether to stay with Duff & Phelps he was never told of the possible acquisition by Security Pacific (Hansen Dep. 5). Guy first learned of the deal when it was publicly announced January 10, 1984.

In April 1984 Guy filed this action for money damages. On January 17, 1985, just a week after the companies publicly announced they had called it quits, Guy moved for leave to amend his complaint to add an alternative remedy of rescission (for convenience the First Amended Complaint, filed February 25, 1985, will be termed the "Complaint").

### Contentions of the Parties

Guy maintains the companies had reached an agreement in principle before Hansen gave him the choice whether to remain with Duff & Phelps or continue his own business. He asserts that agreement was material information that should have been disclosed to him, for he would have opted to stay at Duff & Phelps had he been aware of Security Pacific's lucrative proposal.

Among other grounds for summary judgment defendants urge:

1. Duff & Phelps had no duty to disclose the potential acquisition.

2. Guy has asserted only speculative damages. Failure to show actual damages dooms both the federal and state law claims.

3. Guy's prayer for rescission under the 1934 Act was not timely filed.

4. Guy's prayer for rescission under the Blue Sky Law is defective both because it is untimely and because that statute provides a rescission remedy only to stock purchasers, not sellers.

**3.** This Court's disposition of the case on the first of those grounds, and its discussion of the other grounds, render unnecessary any consideration

Those contentions will be dealt with in turn.[3]

### Duty of Disclosure

Guy cannot prevail on any count of the Complaint unless Duff & Phelps had a duty to disclose to him the contemplated acquisition by Security Pacific. Duff & Phelps contends it had no such duty because:

1. Negotiations were terminated and the deal was "dead" between August 11 and December 1, 1983, a period that spanned Guy's termination date.

2. No agreement in principle had been reached by Duff & Phelps and Security Pacific at any time before Guy's August 15, 1983 termination.

Except to the extent it may bear on the second proposition as an element factually supporting it, the first of those arrows is wide of the mark—for the relevant time period for disclosure was the period during June and July 1983 when Hansen confronted Guy and forced him to make a decision. Though Guy's actual departure postdated the August 11 breakdown of negotiations, he had reached his decision before that date.

But Duff & Phelps' second arrow strikes home. It is clear (and the parties agree) there is no duty to disclose mere negotiations—at least that has been clear until the newly-issued *Michaels* decision discussed later in this opinion. All the pre-*Michaels* authority teaches disclosure is mandated only when agreement, or at least an "agreement in principle," has been achieved. *Greenfield v. Heublein, Inc.*, 742 F.2d 751, 756 (3d Cir.1984), *cert. denied*, —— U.S. ——, 105 S.Ct. 1189, 84 L.Ed.2d 336 (1985); *Reiss v. Pan American World Airways*, 711 F.2d 11, 13–14 (2d Cir.1983). And Guy Mem. 25 concedes no "agreement in principle" is reached until the parties have at least agreed on both price *and* the structure of the deal.

of the several other issues raised in defendants' memoranda and not mentioned in this paragraph of the text.

*Reiss* dealt with a situation legally parallel to that posed by Guy: a complaint by a Pan American securities holder that if then-pending merger negotiations had been disclosed he would have reached a different decision about disposition of those securities. It explained why disclosure is not required—why instead it is actually improper in securities law terms—before all the significant components of a deal have been worked out (711 F.2d at 14):

> Such negotiations are inherently fluid and the eventual outcome is shrouded in uncertainty. Disclosure may in fact be more misleading than secrecy so far as investment decisions are concerned. We are not confronted here with a failure to disclose hard facts which definitely affect a company's financial prospects. Rather, we deal with complex bargaining between two (and often more) parties which may fail as well as succeed, or may succeed on terms which vary greatly from those under consideration at the suggested time of disclosure. We have no doubt that had Pan Am disclosed the existence of negotiations on August 15 and had those negotiations failed, we would have been asked to decide a section 10b-5 action challenging that disclosure.

As the final sentence indicates, had Duff & Phelps "disclosed the existence of negotiations" to Guy, as the result of which Guy decided to stay with Duff & Phelps and give up his lucrative side business, and had the Duff & Phelps-Security Pacific deal ultimately fallen through, Duff & Phelps would have been vulnerable to a Guy lawsuit charging the disclosure had been misleading and he had been damaged.

*Greenfield,* 742 F.2d at 756 put the same concept in somewhat different though substantively identical terms (emphasis added):

> With specific reference to merger discussions, we have held that, so long as they are preliminary, no duty to disclose arises. *Staffin [v. Greenberg],* 672 F.2d [1196,] 1205–07 [(3d Cir.1982)]. We reasoned that because disclosure of such tentative discussions may itself be misleading to shareholders, preliminary

merger discussions *are immaterial as a matter of law. Id.* at 1206; *see also Susquehanna Corp. v. Pan American Sulphur Corp.,* 423 F.2d 1075, 1084–85 (5th Cir.1970). We recognized, however, that as merger discussions progress, the need to protect shareholders from the potentially misleading disclosure gives way to the right of the shareholders to have notice of corporate developments important to their investment decisions. Thus, we further held that "[w]here an agreement in principle [to merge] has been reached a duty to disclose *does* exist." *Staffin,* 672 F.2d at 1207.

That depiction of the Scylla and Charybdis confronted by securities lawyers representing public companies in the corporate acquisition field finds its echo in New York Stock Exchange ("NYSE") Listed Company Manual ("Manual") (Security Pacific is a NYSE-listed company) and in the 1934 Act's disclosure obligations implemented by SEC Form 8–K.

Section 2 of the NYSE Manual is captioned "Disclosure and Reporting Material Information." Though other portions have some relevance here, Section 202.01 is specifically apropos and is reproduced as an appendix to this opinion. It makes plain the Security Pacific obligations extended to imposing on Duff & Phelps the same duty Security Pacific itself had to prevent "untimely and inadvertent disclosure of corporate plans." And that means avoiding disclosure to *anyone* outside top management—Guy of course included. Only in that way can a public company maintain the delicate balance mandated by 1934 Act § 10(b) and Rule 10b–5:

> 1. If the investing public learns prematurely of a favorable corporate acquisition in the works (and the prospective $50 million Duff & Phelps deal was certainly that to Security Pacific), and the acquisition does not then materialize, investors who have bought Security Pacific on the strength of the premature information may have a solid securities law cause of action because of the inflated price they have paid.

2. Late disclosure of the same kind of favorable acquisition that *has* reached the deal stage may provide an equally solid cause of action for investors who have sold stock at a lower figure than the market would have attached to the stock had it known of the acquisition.[4] Had disclosure been made to Guy as he now claims should have been done, the NYSE Manual would have mandated Security Pacific's going public immediately with information as to the negotiation (see the portion of Section 202.01 to which emphasis has been added in the appendix)—thus rendering Security Pacific vulnerable to a wide class of investors if the transaction did not proceed to fruition. Guy cannot expect the tail of his private interest to wag the dog of a public company and its public obligations in that manner.

This Court does not of course mean to suggest the Rule 10b–5 legal standards differ (or should differ) for public and privately-held corporations (see the *Michaels* case hereafter discussed, rejecting a more subjective standard of materiality for the closely-held corporation). What is critical to remember in this case is that Security Pacific had (1) a duty to *withhold* public disclosure when premature, (2) a duty to *make* public disclosure when the deal jelled and (3) as a corollary of controlling importance here, a duty to *require* the party with which it was dealing—Duff & Phelps—to prevent premature leaks by limiting knowledge to the few persons who had to be informed to enable negotiations to move forward. And Duff & Phelps owed a corresponding duty to maintain confidentiality, to avoid the pollution of the market and a distorted trading pattern in Security Pacific stock.[5] That foreclosed—as a matter of affirmative obligation—Duff & Phelps' disclosure to Guy during the preliminary negotiation period.

In another startling example of coincidence (see n. 4), just as this opinion was being placed in final form this Court received last week's opinion of our Court of Appeals in *Michaels v. Michaels*, 767 F.2d 1185 (7th Cir.1985). *Michaels* too involved claims by a seller of stock in a closely-held corporation that material information had been withheld that, if revealed, would have affected his decision to sell. There too the assertedly withheld information had to do (at least in part) with the possible acquisition of the corporation by another company. And there too the seller's claims were grounded in 1934 Act § 10(b), Rule 10b–5, common-law fraud and breach of fiduciary duty.

*Michaels*, 767 F.2d at 1196 first recognized the doctrine of *Greenfield* and *Reiss*:

> The need to protect shareholders from potentially misleading disclosure of preliminary merger negotiations, the courts reason, outweighs the right of shareholders to have notice of corporate developments important to their investment decisions. *Greenfield*, 742 F.2d at 756.

**4.** This analysis of the law applicable to the Duff & Phelps-Security Pacific negotiations, and the obligation of *nondisclosure* to Guy, is really reinforced by the most recent development in this area—a brand new release from the SEC. On July 8, 1985 the SEC issued a ruling that a public company's statement "there were no corporate developments that could account for" a surge in its stock price, made while preliminary negotiations for its acquisition were actually under way, was "materially false and misleading." That was referred to by a major July 10 *Wall Street Journal* article (at page 27 of the Midwest Edition) as a "surprising SEC decision" that "conflicts with a recent ruling [*Greenfield*] by a federal appeals court in Philadelphia." That article closes by quoting the SEC's former general counsel as saying "the commission has tried to overrule a federal appellate court."

What is most significant for current purposes is (1) the corporate release in question was precisely in the universally accepted mold (and was indeed the one required by the NYSE Manual unless "rumors or unusual market activity [had] indicate[d] that information on impending developments ha[d] leaked out," NYSE Manual § 202.03) and (2) the SEC ruling is recognized as an effort to work a substantial change in existing law.

**5.** All of us are familiar with the tipper-tippee phenomenon, in which the inevitable spread of unauthorized information from even the smallest leak often creates a sharp upturn or downturn in price, triggering NYSE—or even SEC—inquiry and sometimes even a suspension in trading. See n. 4.

But *Michaels* did not need to decide whether to adopt the "price and structure" standard of materiality of those cases (767 F.2d at 1195). It declined to find nondisclosure was immaterial as a matter of law, under the circumstances posed in *Michaels*, simply because the "price and structure" threshold had not been overcome. It did so because of the absence of a public market for the stock at issue there (the plaintiff was one of only three shareholders in a family-owned company) (*id.* at 1196).

This Court holds the totally contrasting situation confronting Duff & Phelps brings this case within the *Greenfield-Reiss* doctrine rather than the *Michaels* exception to that doctrine. As already discussed, the status of Security Pacific as a public company (though Duff & Phelps was not) implicated for Duff & Phelps, as well as for Security Pacific itself, all the market-affecting considerations found controlling in *Greenfield-Reiss* and like cases (and acknowledged and approved in *Michaels, id.* at 1196). In *Michaels* the only other shareholders who could conceivably be protected from potentially misleading premature disclosure were the non-disclosing defendants themselves, while here the opposite was true: Securities law guaranteed just such protection to the entire universe of Security Pacific shareholders and potential investors.[6]

Indeed precisely the same considerations cause Guy to founder on an independent requirement of his claims. As *Michaels, id.* at 1199 put it in the securities law context:

> To prevail on a section 10(b) or Rule 10b–5 claim, a plaintiff must also prove scienter—an intent to deceive. *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 212–

14 [96 S.Ct. 1375, 1390–91, 47 L.Ed.2d 668] (1976).

Ordinarily a defendant's knowing withholding of material information could lead to an inference of intent to deceive (*id.* at 1199). But here Hansen's focus was unquestionably on Guy's newly-discovered moonlighting activities, and it is beyond question *that* was the motivation for seeking Guy's departure (had that not been so, Hansen would not have given Guy the option to stay with Duff & Phelps if he abandoned his own business). Against that backdrop and given Duff & Phelps, secrecy obligation to Security Pacific until the latter could go public on an agreement in principle, Guy is not reasonably entitled to an inference of scienter—the intent to deceive.

In sum, the litmus test for the duty to disclose (and relatedly, perhaps for the necessary ingredient of scienter as well) is whether the discussions with Security Pacific had reached the "agreement in principle" stage when Guy had to know the material facts for reaching his decision. That is the standard the litigants here had agreed to pre-*Michaels*, and that is the standard this Court finds controlling post-*Michaels* for the reasons just explored at length.

Where the parties diverge on that score is in their assessment of the state of negotiations as of the end of July 1983. Guy asserts an agreement in principle had been reached, while Duff & Phelps says the parties were still negotiating basic terms. Even when reasonable inferences are drawn (as they must be) in Guy's favor, the record simply does not support his position.

---

**6.** In that respect it is profitable to contrast the totally different situation in *Michaels,* where the undisclosed discussions were (1) a preliminary conversation with an investment firm about possibly looking for a buyer and (2) a preliminary further inquiry of a consultant to a possible acquiring company—someone with whom plaintiff himself had also previously met—asking him to follow up (as promised in plaintiff's presence at the first meeting) about any possible interest in renewing the earlier preliminary discussion. There the deliberate withholding of information from an insider who had been privy to earlier acquisition discussions plainly misled him into believing no sale of the business was in contemplation—an egregious case of material nondisclosure. As *Michaels* said (*id.* at 1196, emphasis added):

> Thus [plaintiff] had a right as a shareholder to know about corporate developments, *but there was no offsetting need to protect other shareholders and investors from potentially misleading disclosure.*

As already explained at length, that could not be said here.

Guy bases his contention on excerpts from the depositions of one negotiator for each side: Duff & Phelps' Francis Jeffries ("Jeffries") and Security Pacific's Will Richeson, Jr. ("Richeson"). But their testimony does not by any stretch establish an agreement in principle.

Jeffries' testimony indicates a tentative agreement as of July 29, 1983 on the total purchase price and the fact the deal would be for cash rather than stock (Jeffries Dep. 64–69). Jeffries spoke *only* of those terms. Nothing in his testimony could lead to an inference the myriad other aspects of the deal had been worked out. And of course anyone who has handled major corporate acquisitions knows a $50 million transaction necessarily involves much more than the bottom-line number to reflect the "agreement in principle" that triggers disclosure.

Richeson's deposition testimony likewise speaks only of negotiations (Richeson Dep. 40–42, 48–50). Nowhere does he even hint a comprehensive deal had been reached. At most the inference from his testimony is comparable to that from Jeffries' deposition: that a tentative price had been reached by late July 1983.

Indeed the undisputed facts support precisely the opposite inference from that urged by Guy. They confirm that no agreement in principle was reached at that time. That conclusion is buttressed by the breakoff of negotiations less than two weeks later (August 11, 1983), a fact strongly indicative of the fact the parties had never come to terms before that time. And as suggested earlier, the same conclusion is reinforced by the otherwise unexplainable failure of publicly-traded Security Pacific to announce an "agreement in principle" during the summer of 1983—a failure that would have breached its NYSE and SEC obligations had such an understanding in fact been reached. When (after the December 1983 revival of negotiations by Security Pacific) an agreement in principle *was* finally reached in January 1984, Security Pacific *did* issue the required public disclosure release. Security

Pacific's obvious awareness of the nature and proper timing of mandated disclosure is shown by the fact it made that public announcement January 10, 1984, though the formal agreement between the parties was not signed until March 23, 1984.

Absence of a duty to disclose is obviously fatal to the 1934 Act claim and to the claim under the Blue Sky Law, which applies the same "material nondisclosure" standard. And the common law claims fail as well, for defendants cannot be deemed to have committed a fraud or breached a fiduciary duty by failing to disclose information that was "immaterial as a matter of law" (*Greenfield*, 742 F.2d at 756) and that they would have been wrong in disclosing.

This resolution of the disclosure issue alone entitles defendants to summary judgment. However, as stated earlier (and in part because of the need to have distinguished the result in *Michaels*, as this Court has done), some other problematic aspects of Guy's claims will be addressed as well.

### *Failure To Show Actual Damages*

Rule 56(e) provides:

When a motion for summary judgment is made and supported as provided in this rule, an adverse party may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.

In response to Duff & Phelps' motion, Guy has produced no specific evidence as to his having suffered actual damages from defendants' nondisclosures and the forced resale of his stock to Duff & Phelps. Defendants say that failure also entitles them to summary judgment as to each of the damage claims.

#### 1. *1934 Act Damage Claim*

Were Guy unable to show actual damages, that deficiency would plainly be fatal to his federal damage claim. 1934 Act § 28(a) (15 U.S.C. § 78bb(a)) provides:

[N]o person permitted to maintain a suit for damages under the provisions of this chapter shall recover, through satisfaction of judgment in one or more actions, a total amount in excess of his actual damages on account of the act complained of.

*Madigan, Inc. v. Goodman,* 357 F.Supp. 1331, 1335 (N.D.Ill.1973), *aff'd in part and rev'd in part,* 498 F.2d 233 (7th Cir.1974) recognized speculative losses are not recoverable:

It [is] clear that the question of damages turns not on what the plaintiffs might have gained, but what has been lost by being allegedly deceived into a purchase. The defendants are liable for such damages as naturally and proximately resulted from the alleged fraud; they are bound to make good the loss sustained.... It is clear that liability does not include the speculative fruits of unrealized profit.

Thus Guy's bald assertion (Mem. 17) that his damages are "real" falls far short of meeting his burden under Rule 56(e).

But Guy is entitled to reasonable inferences from record facts. And the aborted Security Pacific deal, if consummated, would have generated a price many times what Guy realized for his shares.

It is true that deal was predicated on a potential synergism the Federal Reserve Board rejected, and the best evidence the contract price was thus rendered excessive was the ensuing rejection of the deal by arms' length purchaser Security Pacific. Moreover it must always be remembered Guy was a minority stockholder in a closely-held corporation, with no active market for its stock (see *Michaels,* 767 F.2d at 1197). That renders less suspect, as a measure of fair market value in the absence of a buyer for the entire corporation, the book value of Guy's small percentage interest.

Under all the circumstances, then, it might well be that to infer anything about damages, absent any better showing by Guy, would be impermissible guesswork—not "reasonable inference." Nonetheless the enormous disparity between the price under the failed Security Pacific transaction and Duff & Phelps' historic book value might arguably be viewed as implying some damages from Guy's forced sale at the latter figure—perhaps enough of a factual issue to stave off summary judgment. Those conflicting alternatives need not be resolved, however, given the result already reached in this opinion.

### 2. *Illinois Common-Law Claims*

Guy's common-law fraud and breach of fiduciary duty claims would also fail absent proof of actual damages. Actual injury is an essential element of fraud in Illinois. *Cole v. Ignatius,* 114 Ill.App.3d 66, 74, 69 Ill.Dec. 820, 826, 448 N.E.2d 538, 544 (1st Dist.1983); 19 I.L.P. *Fraud* § 15, at 580 (1956) and 1985 pocket part, and cases there cited; see W. Keeton, *Prosser & Keeton on the Law of Torts* § 110, at 765 (5th ed. 1984). Guy has provided, and this Court can locate, no authority for applying a different rule to the fiduciary-breach claim.

Nor would that result be changed by the prayer in Guy's First Amended Complaint for punitive damages as to each of the common-law claims. Punitive damages may not be awarded in the absence of actual or compensatory damages. *In re Busse,* 124 Ill.App.3d 433, 438, 79 Ill.Dec. 747, 751, 464 N.E.2d 651, 655 (1st Dist. 1984).

Once again this Court need not resolve the parties' conflicting positions. It is unnecessary to reject a claim more than once, and the common-law damage claims have already failed the duty-of-disclosure test.

### 3. *Blue Sky Law Damage Claim*

█ Unlike the damage claims already discussed, Guy's Blue Sky Law damage claim also fails for a more fundamental reason not addressed by either party: That statute does not provide a damage remedy. Both in its original version (see Law § 13 A) and as amended (see Law § 13 G), the exclusive private civil remedy it prescribes is rescission. See also *Shofstall v. Allied*

*Van Lines, Inc.,* 455 F.Supp. 351, 358 (N.D. Ill.1978) and *Rotstein v. Reynolds & Co.,* 359 F.Supp. 109, 112–13 (N.D.Ill.1973) (each refusing to imply a remedy for damages under the Blue Sky Law).

Guy has tendered no authority that would permit this Court to imply a damage remedy. No Illinois court has done so during the more than three decades the Blue Sky Law has been on the books—and of course that is the strong inference from the General Assembly's specific creation of a private rescission remedy, and no other, in the statutory section (Law § 13) captioned "Civil Remedies." Indeed Guy Mem. 31 acknowledges (albeit in another context) the strong weight of authority in this District Court is *against* implying remedies under the Illinois statute.

### Timeliness of the 1934 Act Prayer for Rescission

■ Guy's effort to rescind his stock sale via an Amended Complaint came late in the day—fully nine months after he originally filed suit and over a year after the public announcement of the Duff & Phelps-Security Pacific acquisition agreement. Defendants correctly argue that attempt is untimely under the 1934 Act.

*Baumel v. Rosen,* 412 F.2d 571, 574 (4th Cir.1969), *cert. denied,* 396 U.S. 1037, 90 S.Ct. 681, 688, 24 L.Ed.2d 681 (1970)—perhaps the leading case on the subject of 1934 Act rescission claims—teaches:

> Rescission is a radical move, and the law exacts the election of that course to be asserted without wait. The demand is that advice of the determination be given within a reasonable time after discovery of the ground for rescission.

Accord, *Occidental Life Insurance Co. of North Carolina v. Pat Ryan & Associates,* 496 F.2d 1255, 1268 (4th Cir.), *cert. denied,* 419 U.S. 1023, 95 S.Ct. 499, 42 L.Ed.2d 297 (1974); *Gannett Co. v. Register Publish-*

*ing Co.,* 428 F.Supp. 818, 827–28 & n. 21 (D.Conn.1977) and cases there cited. Under *Baumel* and its progeny, delays of as little as one month in demanding rescission have been held to bar claims. *Wassel v. Eglowsky,* 399 F.Supp. 1330, 1364 (D.Md. 1975).

Guy Mem. 14–15 attempts to avoid the impact of those cases by (1) appealing to the general rule that a laches defense may not be asserted without a showing of delay *and* prejudice and (2) saying defendants have shown no prejudice here. But the simple answer is the laches doctrine, applied in the patent infringement cases cited by Guy, is not at all implicated in the rescission of securities purchases or sales.[7] In that area, *Baumel* and its progeny compel an early decision by the injured party— not belated second-guessing.

Even beyond the securities field, general rescission doctrine focuses almost exclusively on delay. Most cases stressing the need for the prompt assertion of rescission rights make no reference to the doctrine of laches, and do not at all mention any need to show prejudice in addition to delay. See, e.g., *Lichter v. Goss,* 232 F.2d 715, 720 (7th Cir.1956); *Farmers Automobile Insurance Association v. Pursley,* 130 Ill.App.2d 980, 985–86, 267 N.E.2d 734, 738 (5th Dist.1971). Those cases treat the prompt election requirement as an integral component of rescission doctrine not dependent on another area of the law. Some earlier cases even treated delay in pursuing rescission as simply an election to proceed with the contract. See, e.g., *Knutson v. Metallic Slab Form Co.,* 128 F.2d 408, 411 (5th Cir.1942).

Even those rescission cases that have made reference to the laches doctrine have downplayed the prejudice element. *Schoenbrod v. Rosenthal,* 36 Ill.App.2d 112, 120, 183 N.E.2d 188, 192 (1st Dist.1962) explained in a case—like this one—involving a fraud claim:

---

**7.** This Court cannot fairly read the comment from the bench by its colleague Judge William Hart in *Jordan v. Duff & Phelps,* 84 C 2428, Tr. at 6 (Mar. 29, 1985) (Pl.Ex.J)—as Guy urges—as a fully studied ruling that prejudice is a prereq-

uisite to barring an untimely rescission claim. There is no indication the authorities presented to this Court had been tendered to and considered by Judge Hart at that time.

In cases based on fraud far greater emphasis is placed on the delay in asserting the claim than on a change of circumstances, for an unreasonable lapse of time between discovering the supposed fraud and bringing the suit is of itself prejudicial to the party charged with fraud. The very nature of the charge calls for prompt action. An unexplained delay raises an immediate doubt as to a plaintiff's right to ask the intervention of a court of equity which is an appeal to justice and good conscience. One who requests the help of a court of equity must be of good faith and must be diligent in prosecuting his claim. The natural reaction of a person who has been defrauded is to cry out in protest and to move with alacrity in seeking redress. When he does neither, his claim and his motives are suspect.

By any standard, then, promptness alone will determine whether Guy may proceed with his rescission claim.

And on that score Guy has simply not acted with the speed the cases mandate. Contrary to Guy's assertion, his rescission remedy could have been invoked in January 1984, as soon as the companies publicly announced their acquisition plans and Guy knew he had a securities claim. At that time, with the Security Pacific transaction awaiting Federal Reserve Board confirmation, Guy could have demanded a return to the status quo. That would have had a double aspect:

1. Guy would have been required to return the purchase price of his shares.

2. As a Duff & Phelps stockholder once again, he (a) would later have realized his ratable share of the sale price to Security Pacific if that deal went ahead or (b) would have remained locked into

his nonmarketable Duff & Phelps minority position if it did not.

Obviously that rescission alternative did not then appeal to him. Whether he viewed the Security Pacific deal as a sure thing, or whether he was unwilling to give up the proceeds of sale, or whether he found the prospect of a return to the Duff & Phelps stockholder fold (to be viewed as a presumably hostile minority owner) unattractive, or whether a combination of those and other factors was at work, is a matter on which this Court need not guess. Whatever his motivation, Guy plainly found the prospect of damages more appealing at the time.

Under the principles demanding prompt rescission, Guy cannot switch signals now simply because he has decided the January 1985 cancellation of the acquisition suddenly rendered rescission more attractive than damages. Guy's prayer for rescission is clearly untimely.

### Unavailability of Rescission Under the Blue Sky Law

■ Much the same might well be said of Guy's Blue Sky Law claim. All the considerations mandating prompt assertion of rescission claims apply with equal force to any such prayer for relief under that statute. Indeed, in the one specifically-prescribed private civil remedy under the Blue Sky Law—a *purchaser's* right of rescission under Law § 13 A—the claim must be asserted within six months (Law § 13 B). That is a timetable Guy would not meet under any reasonable view of the event that started the clock running.[8]

But that is really beside the mark, for the Blue Sky Law does not in terms give an injured *seller* a right of rescission at all.

---

**8.** In that respect Guy refers to the possibility of an equitable extension under *Martin v. Orvis Brothers & Co.*, 25 Ill.App.3d 238, 246, 323 N.E.2d 73, 79 (1st Dist.1974):

> The six months rule regarding notice is not a statute of limitations, but rather, an equitable feature built into the statute to protect against state claims.

But even were the statute applicable, and even if this Court had the power to ignore its uncondi-

tional limitation (a matter as to which there is considerable doubt), *Martin* itself confirms this is precisely the sort of case for which the deadline was created (*id.*):

> Its purpose is to prevent purchasers, who have sufficient knowledge of the remedies available to them, from waiting the entire statute of limitations to decide whether to elect rescission.

Only one provision of the statute might arguably be read that way, and it is a provision Guy himself has not even addressed.

It must be remembered Blue Sky Laws were created solely to provide *purchaser*-oriented remedies. In all the original 19 sections of the carefully-crafted statute, only one subsection spoke of injured sellers at all. Law § 12 F has always read (emphasis added):

It shall be a violation of the provisions of this Act for any person:

\* \* \* \* . \* \*

F. To engage in any transaction, practice or course of business in the sale or purchase of securities which works or tends to work a fraud or deceit upon the purchaser *or seller* thereof.

Every other provision talks only of purchasers and their rights and remedies. But the only statutory consequence of the quoted violation—the only place Law § 12 F is referred to at all—is in the potential of criminal prosecution under Law § 14 B.

By contrast, the civil remedies portion of the Blue Sky Law was specifically designed to protect only purchasers by giving them rescission rights. Law § 13 A (referred to at the outset of this section) expressly states (emphasis added):

Every sale made in violation of the provisions of this Act shall be voidable *at the election of the purchaser....*

Law §§ 13 A, B and C repeatedly refer exclusively to purchasers in speaking of those who may assert a right of rescission. Such careful drafting, particularly when it is eyed in light of the more expansive terms of Law §§ 12 and 14, leaves no room for an implied civil remedy on behalf of sellers. And as Guy implicitly conceded in his memorandum, no court has ever implied such a remedy.

That is the backdrop against which the 1977 amendment adding Law §§ 13 F and 13 G must be read. Under the first of

those provisions the Attorney General may file suit in any circuit court:

to enjoin those persons who are continuing or doing any act in violation of this Act or to enforce compliance with this Act. Upon a proper showing the court shall grant a permanent or preliminary injunction or shall order rescission of any sales, or purchase of equity securities determined to be unlawful under this Act or order of the Secretary.

And Law § 13 G(1) contains nearly identical language authorizing private parties in interest to file suit to prevent violators:

from continuing or doing any act in violation of or to enforce compliance with this Act.

In language parallel to that of Law § 13 F, Law § 13 G(1) also authorizes courts to grant injunctions and to order rescission of unlawful sales.

Even though both subsections thus authorize rescission, they were plainly designed simply to add *prospective* relief to the exclusively retroactive civil and criminal remedies always provided by the Blue Sky Law. Of course the Attorney General's only role under Law § 13 F can be to enjoin ongoing violations and enforce future compliance (for by definition that public official suffers no damages in the legal sense), and the following subsection's nearly identical language plainly seems intended only to grant like authority to private parties in interest. That prospective (rather than retrospective) thrust of both subsections is emphasized by their focus on "continuing" or "doing" violative acts and "enforc[ing] compliance" with the Blue Sky Law. Rescission under both those provisions is thus only an adjunct to injunctive relief, where rescission may be needed to render prospective compliance meaningful or even possible.

This Court will not take the lead[9] in revolutionizing the Blue Sky Law by granting a new private retrospective remedy to sellers. Such a reading would pose a real

---

**9.** Westlaw reflects no Illinois case that discusses Law § 13 G. That research tool leads only to the passing reference in *Witter v. Buchanan*, 132

Ill.App.3d 273, 291, 87 Ill.Dec. 131, 146, 476 N.E.2d 1123, 1136 (1st Dist.1985).

anomaly: In a purchaser-oriented statute, it would exempt sellers from the stringent procedural and temporal requirements imposed on purchasers by Law §§ 13 A and B. It would strain credulity to argue the Illinois legislature would have worked such a drastic change in such a meticulously worded statute by means of those cryptic amendments in Law §§ 13 F and G(1). Guy has not sought solace in the amendments—and this Court will not construct a haven for him there.

### Conclusion

There is no genuine issue of material fact. For at least one (and likely more than one) reason, defendants are entitled to a judgment as a matter of law. This action is dismissed with prejudice.

### Appendix

**202.00  Material Information**

**202.01  Internal Handling of Confidential Corporate Matters**

Unusual market activity or a substantial price change has on occasion occurred in a company's securities shortly before the announcement of an important corporate action or development. Such incidents are extremely embarrassing and damaging to both the company and the Exchange since the public may quickly conclude that someone acted on the basis of inside information.

Negotiations leading to mergers and acquisitions, stock splits, the making of arrangements preparatory to an exchange or tender offer, changes in dividend rates or earnings, calls for redemption, and new contracts, products, or discoveries are the type of developments where the risk of untimely and inadvertent disclosure of corporate plans are most likely to occur. Frequently, these matters require extensive discussion and study by corporate officials before final decisions can be made. Accordingly, extreme care must be used in order to keep the information on a confidential basis.

Where it is possible to confine formal or informal discussions to a small group of the top management of the company or companies involved, and their individual confidential advisors where adequate security can be maintained, premature public announcement may properly be avoided. In this regard, the market action of a company's securities should be closely watched at a time when consideration is being given to important corporate matters. If unusual market activity should arise, the company should be prepared to make an immediate public announcement of the matter.

At some point it usually becomes necessary to involve other persons to conduct preliminary studies or assist in other preparations for contemplated transactions, e.g., business appraisals, tentative financing arrangements, attitude of large outside holders, availability of major blocks of stock, engineering studies and market analyses and surveys. Experience has shown that maintaining security at this point is virtually impossible. *Accordingly, fairness requires that the company make an immediate public announcement as soon as disclosures relating to such important matters are made to outsiders.*

The extent of the disclosures will depend upon the stage of discussions, studies, or negotiations. So far as possible, public statements should be definite as to price, ratio, timing and/or any other pertinent information necessary to permit a reasonable evaluation of the matter. As a minimum, they should include those disclosures made to outsiders. Where an initial announcement cannot be specific or complete, it will need to be supplemented from time to time as more definitive or different terms are discussed or determined.

Corporate employees, as well as directors and officers, should be regularly reminded as a matter of policy that they must not disclose confidential information they may receive in the course of their duties and must not attempt to take advantage of such information themselves.

In view of the importance of this matter and the potential difficulties involved, the

Exchange suggests that a periodic review be made by each company of the manner in which confidential information is being handled within its own organization. A reminder notice of the company's policy to those in sensitive areas might also be helpful.

A sound corporate disclosure policy is essential to the maintenance of a fair and orderly securities market. It should minimize the occasions where the Exchange finds it necessary to temporarily halt trading in a security due to information leaks or rumors in connection with significant corporate transactions.

While the procedures are directed primarily at situations involving two or more companies, they are equally applicable to major corporate developments involving a single company.