Donald J. GUY, Plaintiff,

v.

DUFF AND PHELPS, INC., et al., Defendants.

No. 84 C 2813.

United States District Court, N.D. Illinois, E.D.

Oct. 23, 1987.

Richard C. Leng, Chicago, Ill., for plaintiff.

Edward Fitzpatrick, Lord, Bissell & Brook, Chicago, Ill., for defendants.

MEMORANDUM OPINION AND ORDER

SHADUR, District Judge.

Donald Guy ("Guy") has sued his ex-employer Duff & Phelps, Inc. ("Duff &

Phelps") and its Chairman of the Board and Chief Executive Officer Claire Hansen ("Hansen") for alleged violations of:

1. Securities Exchange Act ("1934 Act") § 10(b)(15 U.S.C. § 78j(b)) and SEC Rule 10b–5 promulgated under the 1934 Act (17 C.F.R. § 240.10b–5),

2. Illinois Securities Law of 1953 ("Blue Sky Law") § 13 A (Ill.Rev.Stat. ch. 121½, ¶ 137.13 A) and

3. defendants' common law fiduciary duties to Guy,

as well as for common law fraud. All Guy's claims stem from defendants' having forced Guy to sell his Duff & Phelps stock back to the company upon termination of his employment.

Guy has moved for reconsideration of this Court's earlier grant of summary judgment on the two common law claims. For the reasons stated in this memorandum opinion and order, reconsideration is granted and summary judgment is granted defendants on Guy's common-law-fraud claim but denied on his breach-of-fiduciary-duty claim.

### Procedural History

On July 12, 1985 (in the "Opinion," 628 F.Supp. 252) this Court granted summary judgment for defendants on all Guy's claims:

1. As to the 1934 Act claims the Opinion, *id.* at 255–59 held Duff & Phelps had no duty to disclose pending negotiations for its possible acquisition by Security Pacific Corporation ("Security Pacific").

2. For essentially the same reason, summary judgment was granted on the common-law claims of breach of fiduciary duty and fraud (*id.* at 259).

3. Finally, the Blue Sky Law claim failed because the exclusive remedy provided by that statute is rescission, and Guy's rescission request was not timely (*id.* at 260–64).

That left only Duff & Phelps' counterclaims pending.

On March 17, 1987 our Court of Appeals decided *Jordan v. Duff and Phelps, Inc.*, 815 F.2d 429 (7th Cir.1987), which took a different view of Duff & Phelps' disclosure obligations under the 1934 Act. This Court then asked the parties to brief the effect of *Jordan* on the previously-disposed of claims. It turned out the 1934 Act claims were still untenable because no instrumentality of commerce had been involved in Guy's face-to-face sale of his stock to Duff & Phelps. Accordingly those claims were dismissed in an oral bench ruling, but the state law claims remain unresolved.[1]

### *Facts* [2]

#### 1. *Guy's Termination* [3]

Duff & Phelps is an Illinois corporation in the business of providing investment research, credit ratings, financial consulting and management services. Guy joined the company in 1978 as a vice president responsible for developing its computer capability and for studying, teaching and implementing new methods of quantitative analysis in investment research and analysis.

Guy had been an assistant professor of finance at Purdue University before joining Duff & Phelps. While at Purdue he had formed his own securities investment advisory business based on a computer model. In 1981 (after he had come to Duff & Phelps) Guy successfully applied to the Commodities Futures Trading Commission to become a registered commodities trading advisor ("CTA"). He then began a small

---

**1.** Though Guy's initial allegations identified this Court's federal-question jurisdiction and then referred to the state-law claims as "pendent," that is really an inaccurate label—this Court's inquiry has confirmed the existence of diversity jurisdiction.

**2.** Rule 56 principles impose on the summary judgment movant the burden of establishing the lack of a genuine issue of material fact (*Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986)). For that purpose

"only reasonable inferences, not every conceivable inference" are drawn "in the light most favorable to the non-movant"—here Guy (*DeValk Lincoln Mercury, Inc. v. Ford Motor Company,* 811 F.2d 326, 329 (7th Cir.1987)).

**3.** As will be seen, the parties differ as to both (1) whether Guy was fired or effectively resigned and (2) the legal significance to be attached to the circumstances of his departure. This opinion uses "termination" as a neutral term.

CTA business without informing his superiors at Duff & Phelps. Indeed he conducted his business in part by using some of Duff & Phelps' facilities—its telephones and computer (that activity, plus the assertedly competitive nature of Guy's business, form the predicate for Duff & Phelps' pending counterclaim).

By July 1983 Guy had 50 to 60 customers and managed portfolios with total assets of about $4 million (Guy Dep. 104–06, 108, 124). Guy earned more than $95,000 from his CTA business in 1982 and $43,000 during the first 8½ months of 1983.

When Duff & Phelps learned of Guy's CTA business in late May or early June 1983, Hansen questioned Guy about its scope (Guy Dep. 148–51; Hansen Dep. 33–34). Guy told Hansen about the CTA business and provided some requested documents (Guy Dep. 150–51; Hansen Dep. 35–44). In mid-July 1983 Hansen told Guy he would have to abandon his CTA business if he wanted to stay with Duff & Phelps (Guy Dep. 163–64), allowing him a month to think over his choice (id. at 164). On July 29 Guy again met with Hansen and said he would not give up the CTA business (Hansen Dep. 61). Hansen then terminated him effective December 31. By agreement the date of Guy's termination was later advanced to September 15, 1983 (Guy Dep. 188–90, 245).

### 2. *Guy's Duff & Phelps Stock*

As a Duff & Phelps officer, Guy could buy stock under its Stock Restriction and Purchase Agreement (the "Agreement"). One provision of the Agreement required each employee-purchaser to sell the shares back to Duff & Phelps at book value upon his or her termination for any reason.[4] Guy therefore surrendered his 200 shares and was paid their book value when he left his employment.

---

**4.** Agreement ¶ 7 read in part:
Upon the termination of the employment with the Corporation of any of the undersigned individuals for any reason, including resignation, discharge, death, disability or retirement, the individual whose employment is terminated or his estate shall sell to the Corporation, and the Corporation shall buy, all

### 3. *Proposed Security Pacific Acquisition*

In 1982 Security Pacific had expressed an interest in acquiring Duff & Phelps (Richeson Dep. 9–16, 21, 24–25). After some preliminary meetings, the companies began serious negotiations in May 1983 (Jeffries Dep. 30–31, 36). At least four face-to-face bargaining sessions were held in June (id. at 25–27, 38). At that time the price under discussion between Hansen and Security Pacific representatives was $50 million, a figure far exceeding the book value of Duff & Phelps' stock.

On July 11 Security Pacific's people told Hansen no further meetings would be needed for five to six weeks (Hansen Dep. 106). Hansen viewed that as an unfavorable sign—an indication of Security Pacific's lack of interest in going ahead (id. at 21–22). Sure enough, on August 11 Security Pacific broke off all negotiations (Richeson Dep. 52, 55, 61, 265–66). At that point the deal was "totally dead" (Richeson Dep. 225), with "absolutely no chance" for renewal (id. at 70–71).

On December 1 Security Pacific came back (wholly unsolicited by Duff & Phelps) to renew discussions, and the companies then negotiated in earnest and struck a deal (announced publicly January 10, 1984). On March 23 they executed a definitive agreement. But because the Federal Reserve Board then refused to approve certain features of the acquisition, the entire transaction was cancelled as of January 9, 1985.

Guy was not told of the possible Security Pacific acquisition while he was deciding whether to give up his CTA business (Hansen Dep. 5). He first learned of the deal when it was announced January 10, 1984. In April 1984 he sued for money damages.

### *Contentions of the Parties*

Guy maintains Duff & Phelps had a fiduciary duty to disclose the status of the shares of the Corporation then owned by such individual or his estate. The price to be paid for such shares shall be equal to the adjusted book value (as hereinabove defined) of the shares on the December 31 which coincides with, or immediately precedes, the date of termination of such individual's employment.

Security Pacific negotiations when he was faced with choosing between his CTA business and continuing with Duff & Phelps. Had Hansen and Duff & Phelps not concealed the negotiations, Guy says he would have stayed with Duff & Phelps rather than leave (a departure that forced the sale of his stock at what would then have appeared to be far less than its true value).

Defendants maintain summary judgment is appropriate for a number of reasons:

1. Duff & Phelps had no common law duty to tell Guy about the potential acquisition because the stock sale was automatic on his termination.

2. Duff & Phelps had no such common law duty because the sale to Security Pacific was not "assured."

3. Guy cannot show Hansen intended to deceive him (a "scienter" requirement).

4. Guy cannot show he was damaged by not knowing about the potential acquisition.

Except for scienter, each of those grounds bears on both Guy's fraud claim and his breach-of-fiduciary-duty claim. All four grounds will be discussed in turn.

### Duty To Disclose on Termination

■ Defendants contend once Guy was terminated the sale of his stock was governed by the Agreement, and Guy had no discretion whether or not to sell. Because sale was automatic, defendants say any information they provided to Guy would be useless to him, so they had no duty to disclose the potential sale.

■ To be sure, when the sale of stock is non-discretionary under a repurchase obligation such as that in the Agreement, the buyer is under no duty to disclose the true value of the stock to the seller (see, e.g., *Toledo Trust Co. v. Nye*, 588 F.2d 202, 209 (6th Cir.1978)). Thus no duty to disclose exists when purchase under a preexisting contract is triggered by death (*id.*), termination (*Blackett v. Clinton E. Frank, Inc.*, 379 F.Supp. 941, 947–48 (N.D.Ill.1974)) or the exercise of a valid option (*Ryan v. J. Walter Thompson Co.*, 453 F.2d 444, 447 (2d Cir.1971) (per curiam)).

For that principle to apply, here, however, this Court would be required (impermissibly) to draw factual inferences in favor of defendants rather than Guy. D.Mem. 14 acknowledges defendants' need to show that "plaintiff[ ] had no control over the event which triggered the right of the defendants to buy the stock pursuant to a valid contractual commitment" (*Toledo Trust*, 588 F.2d at 208). Yet the crux of Guy's claim is that he did ultimately control the decision, and on his own following version of the facts (which this Court *must* now accept because a jury *might*) that is so:

1. Hansen effectively gave Guy a choice between giving up his CTA business and continuing to work for Duff & Phelps.

2. Based on the information he had at the time, Guy decided he wanted to stay with his business rather than with Duff & Phelps.

3. Had Guy known of the pending sale and its effect on the value of the stock, he would have decided differently.

On the automatic-sale issue, then, summary judgment is inappropriate.

### Duty To Disclose When Sale Not Assured

Defendants next argue they had no disclosure obligation because the Security Pacific deal was not at all assured when Guy was deciding which of his options to pursue. That is somewhat akin to the Opinion's holding under both the 1934 Act (628 F.Supp. at 255–59) and the common law (*id.* at 259). Then-existing federal securities law called for a ruling that Duff & Phelps and Security Pacific were required *not* to disclose the potential acquisition because disclosure would have been premature (*id.* at 255–57) and could itself have led to liability under the 1934 Act (*id.* at 257).

*Jordan*, 815 F.2d at 434–38 has since held Duff & Phelps had a duty to disclose the Security Pacific negotiations to an employee-shareholder who was contemplating resignation in November 1983. Drawing upon *Michaels v. Michaels*, 767 F.2d 1185

(7th Cir.1985), *Jordan*, 815 F.2d at 434 held a close corporation buying its own stock had a fiduciary duty to disclose all "material information" to the seller. Despite Security Pacific's public corporation status, *Jordan, id.* rejected the "price and structure" rule for determining the materiality of discussions as to a potential corporate disposition. Instead the issue was viewed as a jury question (*id.*) under the *TSC Industries, Inc. v. Northway, Inc.,* 426 U.S. 438, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976) standard.[5]

Because *Jordan* focused solely on a federal claim under the 1934 Act, it does not resolve the fiduciary-duty issue under Illinois common law. Nonetheless defendants first seek to distinguish Guy's claim from the *Jordan* situation in factual terms. As defendants perceive matters, a favorable state-law result would follow a fortiori from a favorable result in federal-law terms (though an unfavorable federal result would still force an analysis of the state-law issue). There seems little point in that kind of two-level approach to a question on which ascertaining state law is the ultimate goal in any event, so this opinion will turn directly to the relevant Illinois case law.

■ At the outset, the majority shareholder of a closely-held corporation clearly has a fiduciary responsibility to the other shareholders (see, e.g., *Jaffe Commercial Finance Co. v. Harris,* 119 Ill.App.3d 136, 143, 74 Ill.Dec. 722, 728, 456 N.E.2d 224, 230 (1st Dist.1983)). That duty "involve[s] exercising the highest degree of honesty and good faith" (*id.*). But citing to *Hooker v. Midland Steel Co.,* 215 Ill. 444, 74 N.E. 445 (1905) and *Agatucci v. Corradi,* 327 Ill.App. 153, 63 N.E.2d 630 (1st Dist.1945), defendants maintain such fiduciary duties do not extend to transactions in the minority shareholder's stock—at least to require

directors or officers to disclose a potential sale unless it is "assured."

*Hooker* held a corporate director could purchase stock in the corporation from a minority shareholder even though the director knew of an impending sale, "so long as he remains silent, and does not actively mislead the person with whom he deals" (215 Ill. at 451, 74 N.E. at 447). *Hooker* was followed a few years later in *Bawden v. Taylor,* 254 Ill. 464, 98 N.E. 941 (1912) and still later in *Agatucci.* Indeed, that same proposition has been reconfirmed and applied at least as recently as 1977 (*Voss v. Lakefront Realty Corp.,* 48 Ill.App.3d 56, 66, 8 Ill.Dec. 109, 117, 365 N.E.2d 347, 355 (1st Dist.1977); see also, e.g., *Melish v. Vogel,* 35 Ill.App.3d 125, 135, 343 N.E.2d 17, 25 (1st Dist.1975)).[6]

■ *Agatucci,* 327 Ill.App. at 157, 63 N.E.2d at 632 (citation omitted) recognized only a narrow exception to the nondisclosure principle announced in *Hooker* (which *Agatucci, id.* labeled the "majority rule"):

"Special circumstances" such as an assured sale enhancing the value of the stock, known to the officers but not to the stockholder and not ascertainable from the books, modify the "mere failure to disclose" doctrine.

But even if it is assumed both the *Hooker* rule and the *Agattici*-described window have survived in that pristine form, the parties here have missed a critical distinction established by Illinois case law and applicable to this case. *Northern Trust Co. v. Essaness Theatres Corp.,* 348 Ill. App. 134, 141–44, 108 N.E.2d 493, 496–98 (1st Dist.1952) distinguishes between stock purchases from minority shareholders by corporate insiders in their individual capacities (a situation controlled by *Hooker* and *Bawden* ) and such purchases *by the corporation itself.* In the latter situation,

---

**5.** *TSC Industries'* familiar test of materiality is whether "there is a substantial likelihood that a reasonable shareholder would consider [the omitted fact] important in deciding [on his or her course of action]" (426 U.S. at 449, 96 S.Ct. at 2132).

**6.** All the remaining discussion in this section really owes nothing to the litigants' briefing,

which was shallow (on both sides) in dealing with this critical issue. Instead the flushing out of other relevant Illinois cases (*Bawden, Voss, Melish* and the others cited hereafter) had to be done by this Court's law clerk, Robert B. Foster. As always, of course, any credit or fault for what has been made of those cases in this opinion rests with this Court and not its clerk.

*Northern Trust* held the insiders' duties—in their corporate capacities—as fiduciaries for *all* shareholders "make out such a special case" as to require disclosure of facts that render the bargain with the minority shareholder unconscionable.[7]

It may be that the splitting of insiders' fiduciary obligations in that way is illogical. However, this Court's role in diversity cases is simply to ascertain Illinois law. So long as there is no real indication of a shift in Illinois jurisprudence, *Erie v. Tompkins* principles command this Court to follow the established Illinois rule that trial courts are bound to follow the principles announced by the Illinois Appellate Courts as well as by the Illinois Supreme Court.[8] Here there is no reason to believe that the Illinois courts, even if they were forced to a choice between (1) a universal duty of disclosure and (2) no duty of disclosure whichever hat (individual or corporate) the insider is wearing, would opt for the *Hooker* approach rather than *Northern Trust*.[9] For now, though, it is enough that *Northern Trust* is directly in point and undisturbed.

This Court therefore concludes Illinois law (assuming a jury finds Guy controlled the termination decision) required defendants to disclose all material information to Guy. Materiality of the Security Pacific negotiations also presents a jury question, thus barring summary judgment on that issue.

### Scienter

■ Next defendants contend there is no basis for a potential finding (using the appropriate summary judgment standard) that Hansen intended to deceive Guy by withholding the information. When a fraud claim rests on nondisclosure, "concealment must be shown to have been done with the intention to deceive under circumstances creating an opportunity and a duty to speak" (*Dendrinos v. Dendrinos*, 58 Ill. App.3d 639, 642, 16 Ill.Dec. 241, 243, 374 N.E.2d 1016, 1018 (1st Dist.1978) (citation omitted).[10] Opinion, 628 F.Supp. at 258 held Guy was not entitled to an inference of such an intention because Hansen's unquestioned motive in terminating Guy was the latter's outside CTA business and because Hansen had a secrecy obligation to Security Pacific. Defendants maintain that reasoning is still valid, while Guy argues *Jordan* has changed things.

■ True enough, *Jordan*, 815 F.2d at 434 found Duff & Phelps' fiduciary duty to its shareholder was not vitiated by its duty of secrecy to Security Pacific. As the Court viewed the matter (*id.*), Hansen could "whisper in Jordan's ear" about the

---

7. *Northern Trust* did not regard itself as writing on a clean slate in making that distinction. It cited *Wood v. MacLean Drug Co.*, 266 Ill.App. 5, 13–16 (1st Dist.1932), *cert. denied,* as "strikingly similar"—and indeed it is.

8. This Court has frequently addressed what it considers the real mandate of *Erie* in a situation where (as in Illinois) the state law includes choice-of-law rules as to the effect to be given intermediate appellate decisions (see, e.g., *Rizzo v. Means Services, Inc.*, 632 F.Supp. 1115, 1131–33 (N.D.Ill.1986)). It recognizes (of course) the possibility that tension may sometimes exist between that approach and the Illinois–Supreme-Court-predictive approach frequently articulated by other courts. But in this situation no such tension is even potentially in issue.

9. Most recently, *Obermaier v. Obermaier*, 128 Ill.App.3d 602, 607, 83 Ill.Dec. 627, 631, 470 N.E.2d 1047, 1051 (1st Dist.1984) held one owner of a closely held corporation had a duty to a co-owner to disclose the possibility of a future sale of the corporation, even though there had been no firm offer from any prospective buyer. As in *Northern Trust*, the actual buyer of the co-owner's shares was the corporation rather than the insider in his individual capacity. However, any effort to draw from the *Obermaier* decision a resolution of the distinction identified in the text of this opinion is complicated by the fact that the insider held a small slice of the stock (about 4% of the total owned by the seller) as trustee for the seller. Hence the court's ruling was based in part on the fiduciary duty owed by a trustee, and neither of the litigants here could rely too heavily on *Obermaier*.

10. "Duty to speak" appears to mean something less than fiduciary duty, such as that owed by a corporation to its shareholders. When such a fiduciary duty does exist, Illinois recognizes the concept of constructive fraud (*Sale v. Allstate Ins. Co.*, 126 Ill.App.3d 905, 922, 81 Ill.Dec. 901, 912, 467 N.E.2d 1023, 1034 (1st Dist.1984)), so no deceptive intent need be shown.

potential deal.[11] But the issue here—because it must hinge on whether Hansen *believed* he had an obligation of secrecy, or even (stated most favorably to Guy) whether Hansen *reasonably* believed that (see n. 11)—is not altered by the later decision in *Jordan*.[12] It remains true that there is no genuine issue of material fact as to the Hansen–Duff & Phelps lack of intent to deceive Guy.[13]

That, however, defeats only Guy's fraud claim. His breach-of-fiduciary-duty claim can be established even without proof that Hansen intended to deceive Guy. Breach of such a duty of disclosure, if coupled with reliance by the plaintiff and resultant damages, is enough to establish liability (*Sale*, 126 Ill.App.3d at 922, 81 Ill.Dec. 912, 467 N.E.2d at 1034).

### Damages

Finally defendants assert Guy cannot show he was damaged by the concealment. For the most part their argument is circular. D.Mem. 12 says (correctly enough) Guy cannot show damages if he was merely "induced to do only what his legal duty would require him to do in any event" (quoting Prosser & Keeton, *Law of Torts* § 110, at 765 (5th ed. 1984)). Because the Agreement compelled Guy to sell back all his stock upon termination, defendants reason he was not harmed. But more importantly, the Agreement did *not* compel Guy to choose the CTA business over Duff & Phelps. This is really the same contention already discussed and rejected under "Duty To Disclose on Termination."

Defendants also urge Guy cannot show damages because the Security Pacific sale did not go through. That, however, is an argument as to which *Jordan* is really dispositive. As the extended discussion of the damages issue there demonstrates (815 F.2d at 440–43), it may not be easy for Guy to prove he would have acted differently and retained his stock long enough to realize its true value, but this Court cannot conclude there are no damages "as a matter of law, because the merger with Security Pacific fell through" (*id.* at 440).[14]

11. Whispering in people's ears is of course the classic way in which the tipper-tippee information chain inevitably grows ("Can you keep a secret?" "I'll tell the world."). But there is a view, principally held among those who perceive it as a natural outgrowth of Adam-Smithian free market principles, that insider (and a fortiori tippee) trading is a positive good—a stimulant to the operation of the free market. Under such a perspective the whispering of confidential information would not be perceived as troublesome despite the potential for further leakage. But the critical fact here is that *before* the decision in *Jordan,* all the law on the subject of when disclosure of negotiations was permitted (or required) in the context of the publicly-traded company went the other way (see Opinion, 628 F.Supp. at 255–57 and the cases and other authorities cited there). That being so, and with the key issue being Duff & Phelps' (that is, Hansen's) intent, the analysis bears some resemblance to the *Harlow v. Fitzgerald,* 457 U.S. 800, 818, 102 S.Ct. 2727, 2738, 73 L.Ed.2d 396 (1982) immunity inquiry in a different context—except that (1) here the clearly established law when Duff & Phelps acted was for nondisclosure and (2) there is no evidence to justify an intent-to-deceive finding under either a subjective-intent or an objective-intent standard.

12. It is worth noting Jordan simply quit Duff & Phelps for a better job, his job search having been motivated in principal part by a domestic problem (815 F.2d at 432). In sharp contrast, Guy had been caught by Hansen in what the latter perceived to be a breach of Guy's own fiduciary duties to Duff & Phelps—engaging in a competing business with the partial use of the company's resources (628 F.Supp. at 254). This Court does not now decide whether equitable considerations might preclude Guy from recovery here—whether a finding of each side's breach of fiduciary obligations to the other could trigger in pari delicto or similar principles, perhaps leaving each side disentitled to relief.

13. Guy's Mem. 6–7 maintains Hansen's intent to deceive is conclusively established by the uncontested fact that Hansen intentionally did not reveal the Security Pacific negotiations. That confuses the issue. Guy must show more than intentional nondisclosure to establish fraud: He must show Hansen intended to deceive him (see, e.g., *Shivangi v. Dean Witter Reynolds, Inc.,* 825 F.2d 885, 889 (5th Cir.1987)).

14. Even though *Jordan* was addressing a 1934 Act claim, the damage principles it speaks to are more broadly applicable. At the same time, this opinion should not be misunderstood as attempting to resolve the debate between Judges Easterbrook (815 F.2d at 440–43) and Posner (*id.* at 451–52) on the interrelated issues of damages and causation. That will remain for trial (and for the difficult problem of shaping jury

### Conclusion

Because there is no genuine issue of material fact as to one outcome-determinative element of Guy's fraud claim (intent to deceive), defendants are entitled to a judgment as a matter of law on that claim. Summary judgment is precluded by the existence of factual issues on each component of the breach-of-fiduciary-duty claim. This action is set for a status hearing October 29, 1987 at 9 a.m. to discuss' preparation for trial on that claim and Duff & Phelps' counterclaim.

instructions, which appellate judges are spared until they get the opportunity to second-guess

what trial judges have sought to do).